William A. Rossbach
ROSSBACH LAW, P.C.
401 North Washington Street
P.O. Box 8988
Missoula, MT  59807-8988
Phone:  (406) 543-5156
Fax:      (406) 728-8878
bill@rossbachlaw.com

David S. Muraskin
PUBLIC JUSTICE, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
Phone:  (202) 861-5245
dmuraskin@publicjustice.net

J. Dudley Butler
BUTLER FARM & RANCH LAW GROUP, PLLC
499-A Breakwater Dr.
Benton, MS 39039
Phone:  (662) 673-0091
jdb@farmandranchlaw.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA a Montana Corporation,<br><br>          Plaintiff,<br><br>v.<br><br>TOM VILSACK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF | Case No.<br><br><br>**COMPLAINT** |

1

| AGRICULTURE, AND THE UNITED STATES DEPARTMENT OF AGRICULTURE, | |
|---|---|
| Defendants. | |

## I.   INTRODUCTION

1.      This is an as-applied First Amendment suit on behalf of the Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of America ("R-CALF USA") alleging that the United States Department of Agriculture ("USDA") turns over proceeds from a federal tax on each sale of cattle to the private Montana Beef Council, to fund the council's private speech, harming R-CALF USA's members. The government-compelled subsidy of the speech of a private entity, which is not effectively controlled by the government, is unconstitutional under the First Amendment of the United States Constitution and should be enjoined.

2.      R-CALF USA is incorporated and headquartered in Montana. It is a political advocacy and trade organization representing independent cattle producers across the United States, including in Montana, who use quality production methods.  Members live throughout Montana, including the counties within the Great Falls Division. All of its members who are cow-calf producers raise their cattle domestically, using good animal husbandry practices that they believe are best for the animal, herd, and consumers.

3.      R-CALF USA's members' methods stand in contrast to those used by large, multinational producers who source much of their cattle and beef internationally.  Domestic cattle and beef must comply with the United States' rigorous standards concerning the safety, handling, and quality of the animals and product.

4.      For these reasons, polling spanning more than the last decade consistently shows that the overwhelming majority of consumers want to know their food's country of origin, so that they can make informed purchasing decisions.

5.      The differences in production methods is also why R-CALF USA and its members object to and disagree with communications espousing that all beef is equal and/or that fail to distinguish between domestic and foreign beef.  Instead, R-CALF USA and its members advocate for "USA Beef."  They engage in campaigns with such slogans, and seek to advance a regulatory and legislative agenda that will maintain the standards for domestic beef production—setting it apart from foreign beef production—and enable domestic producers to reap the benefits of employing such quality production methods.

6.      However, through a federal tax—labeled an "assessment"—levied by the Beef Promotion and Research Act (the "federal Beef Checkoff") R-CALF USA's Montana members are required to subsidize the speech of the private

Montana Beef Council.  The Montana Beef Council is comprised of individuals aligned with some of the largest multinational, industrial cattle producers, which purchase and raise cattle both domestically and internationally.  As a result, the council engages in promotional campaigns that communicate all beef is equal and it is irrelevant where beef comes from.

7.    For example, money funneled to the Montana Beef Council by the federal Beef Checkoff was used by the council to pay for the billboard below, which encouraged passersby simply to eat "BEEF."



This billboard is emblematic of the council's campaigns, which suggest an equivalency between all beef.  It does not acknowledge distinctions among beef, but rather communicates that consumers should just eat more of it, regardless of where the beef was produced.

8.    In this manner, R-CALF USA's members are being forced to sponsor speech that they do not agree with and would not choose to express if not compelled to do so.  Members of R-CALF USA believe it is important to communicate to consumers that all beef is not equal, that it matters very much

where and how beef is produced, and that consumers should prefer and select beef born, raised, and harvested in the United States.

9.      Although funded by a federal tax, the Montana Beef Council's speech is private speech governed by the First Amendment, not government speech outside the First Amendment's reach.  Indeed, the speech of the Montana Beef Council lacks the central hallmark of government speech: it is in no way controlled or approved by the government, but determined by the private Montana Beef Council.

10.      Accordingly, R-CALF USA's members are being required to subsidize private speech with which they disagree, a plain violation of the First Amendment.  *United States v. United Foods, Inc.*, 533 U.S. 405 (2001).  The current federal Beef Checkoff program, requiring cattle producers to fund the private speech of the Montana Beef Council should be declared unconstitutional under the First Amendment of the United States Constitution and enjoined from continued operation.

**II.      JURISDICTION AND VENUE**

11.      This action arises under the United States Constitution and the laws of the United States.  Therefore, this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

12.     This action also arises under the Court's inherent equitable jurisdiction.

13.     This Court has authority to grant the declaratory and injunctive relief requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as the Court's inherent equitable powers.

14.     Venue is proper in the United States District Court for the District of Montana pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## III.   PARTIES

### a. Plaintiff

15.     Plaintiff R-CALF USA is a nonprofit membership-based organization. It is the largest trade organization in the United States whose voting members are comprised exclusively of independent cattle producers.  R-CALF USA's voting members include cow-calf operators, cattle backgrounders, and feedlot operators. They are located in 42 states.  Its voting members pay dues and have equal voting rights in electing R-CALF USA's directors and setting R-CALF USA's policies.

16.     In Montana, R-CALF USA has 375 voting members.  R-CALF USA's voting members raise cattle in Montana and thus pay the federal Beef Checkoff assessment in Montana, which funds the Montana Beef Council.

17.     R-CALF USA's mission focuses on ensuring the continued profitability and viability of independent producers, particularly, but not

6

exclusively, cow-calf producers who raise their cattle in the United States. This primarily involves advocating for independent United States cattle producers in trade and marketing. Among the trade and marketing practices that most threaten R-CALF USA's members are efforts to treat all beef as equal or that fail to distinguish between where and how beef is produced. Therefore, R-CALF USA and its members engage in campaigns that state "Demand USA Beef" and "Not Just Any Beef. USA-RAISED BEEF. Ask for it."

18. For years. R-CALF USA has advocated that the monies collected under the federal Beef Checkoff be used to promote a similar message. This is particularly important as the number of domestic cattle producers declines year-over-year.

19. R-CALF USA also engages in legislative and regulatory efforts on behalf of its members to ensure the United States maintains its standards and therefore its competitive advantage over foreign countries. For instance, R-CALF USA is actively engaged in monitoring bovine health issues and working with the government to ensure that the domestic cattle herds are protected from infections. It has also advocated for a robust regime of domestic inspections to ensure the health and safety of the animals and protect consumers. R-CALF USA and its members believe that it is best for the domestic meat market and producers when the United States is recognized as a leader on animal health and safety so that

domestic beef will be regarded as particularly desirable.  R-CALF USA works to promote these ends.

20.     Yet, through the federal Beef Checkoff, R-CALF USA's members are required to pay a $1 per head of cattle assessment which finances the program's speech that fails to distinguish between domestic and foreign beef and/or communicates that all beef is equal.  Despite their campaigns and advocacy efforts, R-CALF USA's members, including those in Montana, continue to be required to pay the federal Beef Checkoff's tax to express a message different from the one they desire and which they otherwise would choose not to express.

21.     The harm caused to R-CALF USA's members in Montana is particularly severe because, through its assessment on cattle producers, the federal Beef Checkoff funds the speech of the Montana Beef Council, a private organization that the federal government does not control, or supervise.  Instead, the monies are controlled by the Montana Beef Council's Board, which is comprised of individuals aligned with multinational, industrial companies.  R-CALF USA's members in Montana do not have the same avenues available to them to advocate for their interests before the Montana Beef Council that they would before a governmentally controlled, and thus democratically accountable body.  The Montana Beef Council lacks the requisite political safeguards that make compelled subsidies of government speech constitutional.  In this manner, the

operation of the federal Beef Checkoff in Montana violates R-CALF USA's

members' First Amendment rights through forcing them to subsidize private

speech that communicates a message different from what they would express and

with which they disagree.

22.     Moreover, the Montana Beef Council's erroneous and undesirable

message does not only affect R-CALF USA's Montana members, but R-CALF

USA as an organization and R-CALF USA's members throughout the country.  R-

CALF USA has had to expend resources to attempt to influence and work against

the message of the Montana Beef Council.  Had the Montana Beef Council been

properly accountable, R-CALF USA would not have had to expend these same

resources and it could have instead devoted them to its other functions.

23.     Further, the Montana Beef Council's message reaches beyond its state

borders.  Were the Montana Beef Council democratically accountable, R-CALF

USA's members in Montana would be able to advocate for a message with which

all R-CALF USA members agree, and that would benefit R-CALF USA members

nationwide.  A shared belief that consumers should be informed about the

distinctions between domestic and foreign beef and be encouraged to purchase

domestic beef is one of the primary reasons that producers choose to associate with

R-CALF USA.  Yet, because the Montana Beef Council is a private entity, not

subject to government control, but largely directed by corporate interests, R-CALF

USA's members do not get the full benefit of their association with R-CALF USA and likeminded producers.

**b. Defendants**

24.    Defendant Secretary of Agriculture Tom Vilsack, sued in his official capacity, is charged with overseeing the federal Beef Checkoff.  7 U.S.C. §§ 2904, 2908-09.

25.    Defendant USDA is the agency charged with administering the federal Beef Checkoff.

## IV.    FACTS

**a.    The federal Beef Checkoff's function**

26.    The federal Beef Checkoff is a discrete regulatory scheme established by statute, the sole function of which is to "financ[e] . . . and carry[] out a coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products."  7 U.S.C. § 2901(b).  Monies collected for national promotional campaigns cannot be used to "influenc[e] governmental action or policy."  7 U.S.C. § 2904(10).  The national promotional campaigns also cannot make reference to "a brand or trade name of any beef product" without express approval from the Secretary and others, or "use [] any unfair or deceptive" practices.  7 C.F.R. § 1260.169(d).  Moreover, the national

entity administering the funds cannot spend more than "5 percent of the projected revenue of that fiscal period" on "[a]dminstrative expenses."  7 C.F.R. § 1260.151(a).  The function of the federal Beef Checkoff is to generate speech about beef.

27.    To finance its activities, the federal Beef Checkoff provides for a "one dollar ($1) per head of cattle" assessment to be paid by "a producer" of cattle when the "cattle [is] purchased from such producer."  7 C.F.R. 1260.172(a)(1). Importers of "cattle, beef, or beef products" also pay an assessment of "one dollar per head of cattle or the equivalent thereof."  7 U.S.C. § 2904(8)(C).

28.    Because the federal Beef Checkoff draws money from all producers to promote beef consumption, the assessments are inevitably used to promote the lowest common denominator of beef, no matter the cattle it came from.  For instance, the federal Beef Checkoff is known for funding the "Beef, It's What's For Dinner" advertising campaign, an example of which is below.



29.     In addition to such advertising, the federal Beef Checkoff funds other promotional activities like research and events, but consistently with the goal of encouraging more beef consumption, regardless of the nature and characteristics of the producer or cattle.

30.     Even publications claiming to educate consumers on "Today's Beef Choices" emphasize that "All Beef Is: Grass-Fed[,] Natural[, and] Nutritious," only acknowledging potential differences between beef products in the smaller print below these headlines, and never discussing distinctions between domestic and foreign beef.  Cattlemen's Beef Board & National Cattlemen's Beef Association, *Today's Beef Choices*, http://www.beefitswhatsfordinner.com/choicesofbeef.aspx (last visited April 27, 2015).

31.     The purpose of the federal Beef Checkoff is to fund promotional campaigns that expand the market for beef in the most basic manner, by advancing the notion that beef generally is a desirable product and food source.

### b.  The federal Beef Checkoff's administration

32.     The enabling legislation for the Beef Checkoff establishes a complex scheme of entities to administer the program and develop the promotional campaigns.

33.     It provides that the Secretary of Agriculture appoints "a Cattlemen's Beef Promotion and Research Board" ("Beef Board") to administer the program. *See* 7 U.S.C. § 2904(1)-(2).  The Secretary can also remove all members of the Beef Board.  7 C.F.R. § 1260.213.

34.     The Beef Board elects ten of its members to serve on the twenty person "Beef Promotion Operating Committee" ("Beef Committee").  7 U.S.C. § 2904(4)(A).

35.     The Beef Committee develops the promotional campaigns, *i.e.*, "plans or projects of promotion and advertising, research, consumer information, and industry information, which shall be paid for with assessments collected by the [Beef] Board."  7 U.S.C. § 2904(4)(B).  All of the Beef Committee's plans and projects must be approved by the Secretary. 7 C.F.R. § 1260.169.  All members of the Beef Committee can be removed by the Secretary.  7 C.F.R. § 1260.213.

36.    The other half of the Beef Committee's members are selected from representatives of "[Q]ualified State Beef Councils" who are also members of the Federation of State Beef Councils ("Beef Federation").  7 U.S.C. § 2904(4)(A); 7 C.F.R. § 1260.161(c).

37.    The Beef Federation is a coalition of Qualified State Beef Councils, and is a division of the National Cattlemen's Beef Association ("NCBA").

38.    The NCBA is the trade association of the largest corporate entities involved in the production of beef, and actively engages in lobbying Congress, state legislatures, and federal and state regulators to promote the interests of multinational, industrial producers, packers, and processors—*e.g.*, slaughterhouses and distributors—to the detriment of independent cattle producers.  For example, the NCBA opposes Country-of-Origin Labeling ("COOL").  A suit challenging the COOL regulations, which the NCBA joined, espoused the view that "beef is beef, whether the cattle were born in Montana, Manitoba, or Mazatlán."  First Amended Complaint, ¶ 34, *Am. Meat Inst. v. U.S. Dep't of Ag.*, No. 13-1033, 2013 WL 4786371 (D.D.C. July, 23, 2013).

39.    A Qualified State Beef Council is an entity located in a state that receives a "certifi[cation]" from the Beef Board.  7 C.F.R. § 1260.181(b).

40.    To be certified as a "Qualified State Beef Council" the entity must be "organized and operating within a State."  7 C.F.R. 1260.181(a).  Moreover, at the

time the entity was certified as a Qualified State Beef Council, it must have been
"receiv[ing] assessments or contributions from producers and conduct[ing] beef
promotion, research, consumer information and/or industry information programs."
*Id*.

41.     In order to be certified as a Qualified State Beef Council the entity
must also:

i.   Conduct "plans or projects for promotion, research, consumer
     information, and industry information, with respect to beef and
     beef product designed to strengthen the beef industry's position in
     the marketplace" and/or "conduct research and studies . . . to the
     end that marketing and utilization of beef and beef products may
     be encouraged and expanded";

ii.  Agree to collect the assessments required by the federal Beef
     Checkoff;

iii. Identify how those assessments will be collected "to ensure that
     assessments due are paid";

iv.  Agree to remit to the Beef Board the appropriate amount of the
     assessments paid under the federal Beef Checkoff;

    v.   Agree to provide an annual audit of all of the money collected under the federal Beef Checkoff and "any other reports and information the [Beef] Board or Secretary may request"; and

    vi.   Agree not to use any of the assessments paid under the federal Beef Checkoff to "influenc[e] governmental policy or action or to fund plans or projects which make use of any unfair or deceptive acts or practices."

*Id.* (cross-referencing 7 C.F.R. § 1260.169); *see also* 7 U.S.C. § 2904(8)(A).

42.    In other words, to be a Qualified State Beef Council an entity must agree to act as the collection service for the federal Beef Checkoff and must be focused on developing promotional campaigns like those of the Beef Board and Beef Committee.

43.    If there is no Qualified State Beef Council, the assessments mandated by the federal Beef Checkoff are collected by the Beef Board.  7 U.S.C. § 2904(8)(B).

44.    The Secretary of Agriculture is charged with overseeing the national bodies (the Beef Board and Beef Committee) that administer the federal Beef Checkoff, including approving the Beef Committee's budget, plans and projects, and the Beef Board's investments of federal Beef Checkoff funds.  7 U.S.C. § 2904(4)(C), (6)(B), (9).  According to the Beef Board, a USDA official also

attends all Board meetings.  Exhibit A 11.  The Secretary may also "inspect[] and audit[]" the Beef Board and Beef Committee and has the power to conduct investigations to ensure compliance with the statute.  7 U.S.C. § 2904(7)(A).

45.     In addition, "the Secretary exercises final approval authority over every word used in every promotional campaign" of the Beef Committee.  *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561 (2005).  "All proposed promotional messages [of the Beef Committee] are reviewed by Department officials both for substance and for wording, and some proposals are rejected or rewritten by the Department.  Nor is the Secretary's role limited to final approval or rejection: Officials of the Department also attend and participate in the open meetings" of the Beef Committee "at which proposals are developed."  *Id.*

### c.  **The federal Beef Checkoff funds Qualified State Beef Councils**

46.     The $1 per head assessment producers are required to pay under the federal Beef Checkoff not only funds the Beef Board and the Beef Committee, but also the Qualified State Beef Councils, which has profound constitutional consequences given the differences between the entities.

47.     As explained by the Beef Board, a "Qualified State Beef Council [] collects the dollar and sends 50 cents of each dollar to the Cattlemen's Beef Board for investment into national checkoff programs," keeping the other 50 cents for its activities.  Exhibit B 6.  Similarly, USDA's Office of Inspector General explained

that "Qualified State [B]eef [C]ouncils [] collect the domestic assessments and are

responsible for forwarding half of the funds each month to the [B]eef [B]oard,

which manages the national program."  Exhibit C 2.

48.     This is how the Beef Board depicts the operation of the federal Beef

Checkoff.



Exhibit B 13.

49.     The Secretary of Agriculture has used a similar diagram to

demonstrate the flow of federal Beef Checkoff dollars.  Exhibit D.

50.     The dollars the federal Beef Checkoff mandates producers pay first go

to the state's Qualified State Beef Council, which siphons off half of those dollars

for its own purposes, and transfers the remainder to the Beef Board.

**d. The federal government does not control the speech of the Qualified State Beef Councils**

51.     The federal Beef Checkoff does not provide for governmental control, or supervision of how Qualified State Beef Councils expend the money they obtain from the federal Beef Checkoff.

52.     As the Beef Board explained, "[Qualified State Beef Councils] can invest their 50 cents" as they choose.  Exhibit B 7.  Indeed, the Beef Board's notes to the flow chart above describe that only 50 cents of the federal Checkoff funds are "for national programs," with the remainder "retained" and "watched over by producers chosen by their states."  *Id.* at 13.

53.     The Secretary of Agriculture does not control the operation or advocacy of the Qualified State Beef Councils.  In contrast to the Secretary's direct control of the Beef Board and Beef Committee, the Secretary:

i.   Does not appoint the members of the Qualified State Beef Councils.

ii.  Is not required to approve the budgets or investments of the Qualified State Beef Councils.

iii. Is not authorized to remove members of the Qualified State Beef Councils.

iv.   Is not required to approve the plans or projects of the Qualified

State Beef Councils.

v.   Need not approve the substance of the Qualified State Beef

Councils' promotional campaigns.

vi.   Need not approve the wording of the Qualified State Beef

Councils' promotional campaigns.

54.   In fact, USDA rejected "[s]everal comments" submitted during the

notice and comment period on the federal Beef Checkoff regulations suggesting

that USDA provide for regular audits of Qualified State Beef Council's

expenditures "to ensure that the monies received under the Act are spent in

accordance with the Act."  Beef Promotion and Research Order, 51 Fed. Reg.

26132, 26137 (July 18, 1986).  Instead, USDA concluded that it is sufficient to

merely require the Qualified State Beef Councils to submit a report of their

expenditures *after* the expenditures are made, and to agree that they will not use

the federal Beef Checkoff assessments to "influence governmental policy or

action."  *Id.*

55.   As a result, while USDA has issued guidelines for its Agricultural

Marketing Service ("AMS") to review the federal government's expenditure of

federal Beef Checkoff funds in order to ensure that the funds are properly

administered, those guidelines expressly "do not apply" to "State . . . programs"

because no "statute or regulation" "direct[s]" them to apply.  Exhibit E 2.  While

the guidelines recognize that "AMS has an obligation to ensure that national

checkoff funds are expended appropriately," they also emphasize that "AMS does

not have direct oversight of the[] State and local programs."  *Id.*

56.    AMS's oversight is insufficient to ensure the Beef Board and Beef

Committee properly expend the money they obtain through the federal Beef

Checkoff.  USDA's Office of Inspector General found AMS's oversight of the

Beef Board lacking, stating AMS had "inadequate" procedures for overseeing the

Beef Board.  Exhibit C 6.  Consistent with this, the Beef Board's self-audits have

revealed that the NCBA "breached the financial firewall" between the Beef Board

and the NCBA, using federal Beef Checkoff dollars for the NCBA's political

activities.  Exhibit F 4.

57.    Nonetheless, while guidelines exist to review the federal

government's expenditure of checkoff funds, on information and belief, USDA has

never attempted to issue guidelines for AMS's review of Qualified State Beef

Councils.

58.    Qualified State Beef Councils receive half of the monetary

assessments mandated by the federal Beef Checkoff that are collected in their state.

Like the Beef Board and Beef Committee, Qualified State Beef Councils use those

funds to design and implement promotional campaigns.  However, unlike the

federal expenditure of the federal Beef Checkoff funds, the nature and content of the Qualified State Beef Councils' speech funded by the federal Beef Checkoff are unregulated by the Secretary of Agriculture, his designees, or any other federal official.

### e. The Montana Beef Council

59.     The Montana Beef Council is a Qualified State Beef Council.  It collects federal Beef Checkoff funds and transmits 50 cents of each dollar collected under the federal Beef Checkoff to the Beef Board, keeping the other 50 cents for its activities.

60.     The Montana State Beef Council is a privately incorporated business.

61.     Its only connection to the state of Montana is that the state Department of Livestock contracts with the Montana Beef Council to collect the $1 per head federal Beef Checkoff assessment on behalf of the Montana Beef Council. Mont. Code Ann. § 81-8-901(1).

62.     The Montana Beef Council reimburses the state Department of Livestock for its expenses from collecting the federal Beef Checkoff assessment. *Id.* § 81-8-901(2).

63.     The state of Montana does not impose any state tax on cattle producers similar to the federal Beef Checkoff and does not fund the Montana Beef Council.

64.    Between October 2014 and September 2015, the Montana Beef Council obtained more than $870,000 in funds from the federal Beef Checkoff.  It collected $1,219 through other sources.  Around $550,000 of the money collected and retained by the Montana Beef Council from the federal Beef Checkoff was spent directly on promotional campaigns.  More than $300,000 was spent on administrative costs, far exceeding the limits placed on the Beef Board, which can only spend 5% of its funds on administrative expenses.  Exhibit G 1; *see also* 7 C.F.R. § 1260.151(a).

65.    The figures for fiscal year 2016 are not yet available, but the Montana Beef Council states that it will expend $1.8 million on its promotional campaigns from October 2015 through September 2016, all "funded through Montana's 50 cent in-state portion of the $1 per head checkoff," with the expenditures approved after the "deliberations" of the Montana Beef Council.  *Montana Beef Checkoff Directors Set Work Plan for Upcoming Fiscal Year* (Sept. 29, 2015), https://mtbeef.org/montana-beef-checkoff-directors-set-work-plan-for-upcoming-fiscal-year/.  This budget again includes around $300,000 for administrative expenses.  *Id.*

66.    Like the Beef Board, the Montana Beef Council is closely aligned with the interests of major multinational companies, rather than independent producers.  The Montana Beef Council and the expenditure of the funds it receives

23

from the federal Beef Checkoff are controlled by a twelve member Board, many of whom are directly aligned with the NCBA.

    i.    Two of the Montana Beef Council's Board Members represent the Montana Stockgrowers Association, which is a state affiliate of the NCBA.

    ii.    One council Board Member represents the American National Cattlewomen's Association, which is affiliated with the NCBA. Indeed, Linda Swanz, the Cattlewomen's Association's current representative on the Montana Beef Council is or was on the Board of Directors of the NCBA.

    iii.    Another Montana Beef Council Board Member represents the Montana Angus Association which, through its national organization, is a breed affiliate of the NCBA.

    iv.    Yet, another council Board Member represents the Montana Cattle Feeders, which shares office space and works with the Montana Stockgrowers Association, which is the state affiliate of the NCBA.

67.    In short, five of the twelve Board Members of the Montana Beef Council are directly associated with the NCBA, the national lobbying group of

multinational, industrial cattle producers, packers, and processors, who have actively worked against the interests of independent domestic cattle producers.

68.    Consistent with this, the promotional campaigns of the Montana Beef Council aim to increase beef consumption generally, without distinguishing between where or how the cattle were raised, and have even promoted international beef over domestic beef.  At the same time, the council states that all Montana cattle producers endorse its message.  Indeed, the Executive Director of the Montana Beef Council has written that the council's "[p]rograms . . . are brought to you by the *Montana Beef Producers* and Checkoff dollars."  Chaley Harney, *On the Horizon-Montana Beef Council* (Nov. 6, 2013), http://mtbeef.org/on-the-horizon-montana-beef-council/ (emphasis added).

69.    For example—engaging in a campaign that would have been prohibited had it been undertaken by the Beef Committee, 7 C.F.R. § 1260.169(d) (prohibiting the Beef Committee from making reference to brand or trade names without the express consent of the Beef Board and Secretary)—the Montana Beef Council entered into a "partnership" with fast-food chain Wendy's to promote Wendy's Bacon Ciabatta Cheeseburger.  Working together, the two companies "collaborat[ed]" to develop digital, radio, and television advertising for Wendy's product.  They also funded special events where consumers could "upgrade" their Bacon Ciabatta Cheeseburgers with additional beef patties at no-charge.  However,

on information and belief, Wendy's only committed that the beef used in the
product would be fresh, not frozen, beef from cattle raised in *North America*—
which could encompass cattle from 41 different countries and territories, from
Canada to Panama, as well as the Caribbean islands.  Wendy's made no
commitment that the beef would come from cattle raised in Montana or even the
United States.  Nonetheless, the Montana Beef Council trumpeted this campaign as
part of Montana's "Beef Checkoff investment," *i.e.*, "the $1-per-head assessment
made by beef producers, also known as the Beef Checkoff" that the Montana Beef
Council "administers."  MT Beef Council & Wendy's of Montana, *Fun MT Beef
Council & Wendy's Partnership* (Feb. 21, 2014),
http://www.backup.northernag.net/AGNews/tabid/171/articleType/ArticleView/art
icleId/8961/Fun-MT-Beef-Council-Wendys-Partnership.aspx.

70.    In addition, in October 2015, the Montana Beef Council partnered
with the Montana State University ("MSU") football team to encourage fans to
purchase and eat more beef, regardless of where it was from.  During the first
three-quarters of a game the University mascot, the MSU Bobcat, wore a jersey
emblazoned with the slogan, "Bobcats Love Beef."  Before the game, the Montana
Beef Council gave away a grill through the MSU Bobcats' Facebook page.  And,
after the game, the Montana Beef Council sponsored an event with players where
attendees were given beef seasoning.  Exhibit G 1.

71.    As illustrated by the billboard reproduced in the introduction, the advertisements and events of the Montana Beef Council are typically emblazoned with the Montana Beef Council's unique logo, shown below.



72.    Underscoring the interconnection between the federal Beef Checkoff and the Montana Beef Council, the Montana Beef Council's logo incorporates a portion of the federal Beef Checkoff logo, shown below.



73.    However, the state outline and text in the Montana Beef Council's logo ensure that the promotional campaigns of the Montana Beef Council are distinguished from those of the Beef Board and Beef Committee.

74.    None of the Montana Beef Council's activities are undertaken with the direct oversight of the Secretary of Agriculture or any other federal official. Moreover, on information and belief, neither USDA nor the Montana Beef Council has established a procedure by which a cattle producer who disagrees with the

Montana Beef Council's message can request that the complete amount of his assessments be directed to the Beef Board, a body controlled by the federal government.

75.     Unlike with the Beef Board, members of the Montana Beef Council are not appointed by a federal official.

76.     Unlike with Beef Committee, the budget of the Montana Beef Council need not be approved by a federal official.

77.     Unlike with the Beef Committee, members of the Montana Beef Council may not be removed by a federal official.

78.     Unlike with the Beef Committee, the promotional campaigns of the Montana Beef Council need not be approved by a federal official.

79.     On information and belief, unlike with the Beef Committee, each proposed campaign of the Montana Beef Council is not reviewed by a federal official.

80.     On information and belief, unlike with the Beef Committee, a proposed campaign of the Montana Beef Council has never been rewritten by a federal official.

81.     On information and belief, unlike with the Beef Committee, a meeting of the Montana Beef Council has never been attended by a federal official.

82.     The only regular check on the Montana Beef Council is an audit the council provides the *Beef Board after* the assessment have been collected and expended, so that the *Beef Board* can ensure half of the assessments collected were passed along.  7 C.F.R. § 1260.181(b)(6).

**f.     A compelled federal assessment funding the speech of an unregulated private entity violates the First Amendment of the United States Constitution**

83.     The First Amendment prohibits the government from compelling an individual to subsidize, and thereby associate with another's private speech. *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001).

84.     This is true even if the speech is commercial speech.  *Id.*

85.     However, the Supreme Court has recognized two relevant exceptions to this rule:

      i.     When the government compelled subsidy is funding a broader regulatory scheme where speech is not the principal goal of the program, but merely incident to the other, non-speech related objectives, *id.* at 414-15 (citing *Glickman v. Wileman Brothers & Elliott, Inc.*, 521 U.S. 457 (1997)); and

        ii.     Even where the primary function of the subsidy is to fund

speech, that speech is government speech, not private speech,

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559 (2005).

In either circumstance, the Court has explained, the First Amendment does not

apply.

86.    The Supreme Court has held that the principal objective of compelled

subsidies that fund promotional campaigns is to fund speech, not other regulatory

activities.  *United Foods, Inc.*, 533 U.S. at 415; *accord Johanns*, 544 U.S. at 558.

87.    Thus, the first exception is inapplicable.  The Montana Beef Council's

function is essentially identical to that of the entity at issue in *United Foods*,

meaning the compelled subsidies that finance its activities fund speech, not some

broader regulatory scheme for which the speech is merely incidental.

88.    The Supreme Court has considered the Beef Committee's speech

funded by the federal Beef Checkoff and concluded that it was government speech.

*Johanns,* 544 U.S. 550.  However, this conclusion rested on the fact that "[t]he

message of the promotional campaigns [was] effectively controlled by the Federal

Government itself." *Id.* at 560.  In particular, the Court relied on the fact that the

Secretary of Agriculture was involved in overseeing, developing, revising, and

approving all of the promotional campaigns of the Beef Committee.  *Id*. at 560-62.

89.     *Johanns* did not consider the speech of the Qualified State Beef Councils.  Indeed, it only mentioned in a footnote that "only 50 cents per head [of the assessment] is remitted to the Beef Board," with the Court believing that the remaining 50 cents goes "in voluntary contributions to [] state beef councils."  *Id.* 554 n.1.  The Court's assumption that the contributions are voluntary, which was not tested in *Johanns*, is inaccurate here.  On information and belief, there are no established governmental assessments, voluntary or otherwise, specifically meant to fund the Montana Beef Council.  Instead, as explained by the Beef Board, the Montana Beef Council takes 50 cents of every dollar collected that is due to the federal Beef Checkoff, no matter what.  On information and belief, the Montana Beef Council does not provide cattle producers the opportunity to either recoup or redirect the money retained by the council.  Essentially all of its income comes from retaining the federal assessment.

90.     The Montana Beef Council is using a federal tax to fund its private speech.

91.     The speech of the Montana Beef Council, funded through the federal Beef Checkoff's assessments, is not government speech.

92.     The federal government exercises no control over the speech of the Montana Beef Council.

93.     The state of Montana exercises no control over the speech of the Montana Beef Council.

94.     The Montana Beef Council is an entirely private entity to which the federal government turns over the tax, *i.e.* the "assessments" established by the federal Beef Checkoff, that the federal government mandates all cattle producers in Montana pay, and allows the council to use that money to freely generate its own speech.  Thus, the speech of the Montana Beef Council is protected by the First Amendment, and it is unconstitutional to compel R-CALF USA's members to subsidize that speech.

95.     Even if effective governmental control of the speech were not the test for whether something is government speech—a conclusion that would require a wholescale reconsideration of *Johanns,* 544 U.S. 550—the speech of the Montana Beef Council would not qualify as government speech.

      i.     The speech of the Montana Beef Council is not meant to convey the government's selected thoughts or instill some government selected feeling.

      ii.     The recipients of the Montana Beef Council's speech would not and should not understand it to be conveying a governmental message.  Most, if not all, of the Montana Beef Council's speech is accurately branded as separate and distinct from the

speech of the Beef Board and Beef Committee, in order to demonstrate that it is coming from the Montana Beef Council, a private entity, not controlled by the government.  Moreover, neither the portion of the federal Beef Checkoff logo incorporated into the Montana Beef Council's logo, nor the federal Beef Checkoff logo itself indicates that the federal Beef Checkoff is a government program.

iii.   The speech of the Montana Beef Council disproportionally burdens R-CALF's members from engaging in their desired form of speech.  On information and belief, there are additional opportunities for advertising and other promotional campaigns in the Montana market, which R-CALF USA's members could use to publicize speech of their choosing.  However, by forcing R-CALF USA's members to fund the Montana Beef Council's speech, the federal Beef Checkoff is reducing R-CALF USA's members' ability to promote their viewpoints and increasing the cost of them doing so.  The federal Beef Checkoff is taking away funds that R-CALF USA's members could use to generate their desired speech.  At the same time, the message R-CALF USA's members are being required to fund would

necessitate them expending even greater resources than they would have to otherwise to educate consumers that all beef is not equal and/or that consumers should prefer USA beef. The federal Beef Checkoff is doing this without furthering a legitimate governmental objective. The Montana Beef Council's speech is private speech, not controlled by the government, and the council's message discourages consumers from recognizing relevant distinctions in cattle origins—with resulting health, environmental, and ethical consequences. In sum, the societal benefits cannot possibly justify the current program.

96.     The operation of the federal Beef Checkoff in Montana violates the First Amendment. The federal government is compelling producers to fund private speech that communicates a message with which they disagree. It is failing to control that speech. Consistent with this, nothing about the speech indicates that it is government speech. Thus, the current operation of the federal Beef Checkoff is narrowing the marketplace of ideas without appropriately advancing a governmental interest.

97.     The current operation of the federal Beef Checkoff in Montana should be declared unconstitutional and enjoined.

## V.    CAUSE OF ACTION: FIRST AMENDMENT VIOLATION

98.    Plaintiff re-alleges and incorporates by reference all of the allegations set forth above.

99.    The current manner in which the federal Beef Checkoff provides for and allows the Montana Beef Council to utilize the assessments mandated by the federal Beef Checkoff violates the First Amendment of the United State Constitution.  The assessments are a compelled subsidy of speech that R-CALF USA's members would not choose to express and that communicates a message with which they disagree.  The government does not effectively control the speech that the Montana Beef Council funds with the federal Beef Checkoff's assessments.  Thus, the federal Beef Checkoff is mandating that R-CALF USA's members fund and associate with the private speech of the Montana Beef Council, which violates the First Amendment.

100.    There are no administrative remedies that would correct this constitutional violation.

101.    Plaintiff has no adequate remedy at law and is entitled to injunctive and declaratory relief for this claim.

## VI.    PRAYER FOR RELIEF

102.   Plaintiff requests that the court enter a judgment:

i.    Declaring the current operation of the federal Beef Checkoff, which allows the Montana Beef Council to use the federal Beef Checkoff to fund its private speech, unconstitutional under the First Amendment;

ii.    Enjoining the Secretary of Agriculture, as well as his officers, agents, employees, attorneys, and all other persons in active concert or participation with him or his officers, from continuing to allow the Montana Beef Council to utilize assessments collected under the federal Beef Checkoff unless and until the operation of the Beef Checkoff is brought into line with the United States Constitution;

iii.    To ensure that the public has accurate notice of the requirements of the law, requiring the government to provide public notice that the challenged aspects of the federal Beef Checkoff are unconstitutional and will not remain in effect;

iv.    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

v.    Awarding such other relief as may be just and proper.

RESPECTFULLY SUBMITTED this 2nd day of May, 2016.

ROSSBACH LAW, PC


By: ____/s/ William A. Rossbach____
        William A. Rossbach

David S. Muraskin
PUBLIC JUSTICE, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036

J. Dudley Butler
BUTLER FARM & RANCH LAW GROUP,
PLLC
499-A Breakwater Dr.
Benton, MS 39039

*Attorneys for Plaintiffs*