# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>SONNY PERDUE, in his official capacity as Secretary of Agriculture, and the UNITED STATES DEPARTMENT OF AGRICULTURE,<br><br>      Defendants,<br><br>vs.<br><br>MONTANA BEEF COUNCIL, et al.<br><br>      Defendant-Intervenors. | **CV-16-41-GF-BMM**<br><br><br>FINDINGS AND RECOMMENDATIONS |

## Background

The Beef Promotion and Research Act of 1985 ("Beef Act"), 7 U.S.C. § 2901 *et seq.*, imposes a $1 assessment on cattle producers for each head of cattle sold in the United States. It imposes the same assessment on each head of cattle imported into the United States. 7 U.S.C. §§ 2901(b), 2904(8)(C); 7 C.F.R. §

1

1260.172(a)(1). The assessment, also known as a checkoff, funds beef related promotional campaigns designed to "strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets . . . for beef and beef products." 7 U.S.C. § 2901(b). The Cattlemen's Beef Promotion and Research Board ("Beef Board") runs the federal checkoff program. *See* 7 U.S.C. § 2904(1)-(2).

Qualified state beef councils ("QSBCs"), which may be either private entities organized and operating within a state or entities authorized by state statute, may collect the checkoff assessments on behalf of the Beef Board. *See* 7 C.F.R. § 1260.172(a)(2). Before QSBCs may collect assessments, they must receive certification from the Beef Board. *See id.* § 1260.181(a). In certain limited circumstances, the Beef Board may decertify QSBCs. (*See* Doc. 40-1 (Payne Declaration) ¶ 29 (citing 7 C.F.R. § 1260.181).)

When QSBCs collect the one dollar per-head checkoff from a cattle producer, it sends 50 cents from each dollar to the Beef Board. QSBCs retain the remaining 50 cents to fund its own promotional activities. 7 U.S.C. § 2904(8)(C); 7 C.F.R. § 1260.172(a)(3).

The flow of the producers' one-dollar assessments—from producer to QSBCs to the Beef Board with QSBCs keeping their 50 cents—operates as the default process. Producers have the option, however, to opt-out of paying QSBCs

any of their assessment. The "Redirection Rule" allows producers to "request a redirection of assessments from a Qualified State Beef Council to the Board" by "submitting a redirection request" and requires that QSBCs agree that any such requests "will be honored" as a condition of certification. 7 C.F.R. §§ 1260.172(a)(7), 1260.181(b)(8).

USDA possesses limited statutory and regulatory authority over QSBCs use of checkoff funds. USDA allows QSBCs to engage in promotional activities that "strengthen the beef industry's position in the marketplace." 7 C.F.R. § 1260.181(b)(1); *see* 7 C.F.R. § 1260.169 (defining activities that QSBCs may conduct under § 1260.181(b)(1) to include "projects for promotion" of the beef industry). QSBCs must certify, however, that they will not use any of the money that they receive under the Beef Checkoff Program to promote "unfair or deceptive" practices, or to "influenc[e] governmental policy." 7 C.F.R. § 1260.181(b)(7).

In addition to USDA's limited statutory and regulatory authority, USDA now possesses significant authority stemming from Memoranda of Understanding ("MOU") that USDA has entered into with all 15 QSBCs in this lawsuit.  Under the MOUs, QSBCs agree to submit to USDA "for pre-approval any and all promotion, advertising, research, and consumer information plans and projects." (Ex. 18, Doc. 91-1 at RCALF_000045.)  QSBCs must also provide USDA with

3

advance notice of any QSBC board meetings and allow a USDA official to attend. (*Id.*) If any QSBC fails to comply with the MOUs, USDA may "direct the Beef Board to de-certify [the QSBC], and, in the event of such de-certification, [the QSBC] shall stop receiving" checkoff funds. (*Id.* at RCALF_000046.)

## Analysis

The primary issue relevant here is whether speech by QSBCs constitutes government speech. Defendants Sonny Perdue, in his official capacity as Secretary of Agriculture, and the U.S. Department of Agriculture (collectively the "Government") and Defendant-Intervenors raise a few other threshold questions related to Article III standing and the Redirection Rule, 84 Fed. Reg. 20,765, 20,766 (May 13, 2019). The Court will address those in short order, ruling in favor of Plaintiff Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of America ("R-CALF"), before moving on to the question of government speech.

### Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### Standing

Article III of the Constitution limits the judicial power of federal courts to the resolution of cases and controversies. *See* U.S. Const. art. III. A case or

4

controversy exists under Article III only if the Plaintiff possesses standing.

*Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002). An individual has Article III

standing if he or she satisfies three elements: (1) injury-in-fact; (2) causation; and

(3) redressability. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 102-03

(1998).

Organizations may bring lawsuits but face different standing requirements

than the typical three elements of standing. If an organization seeks to bring a

lawsuit on behalf of its members, the organization must demonstrate that "(a) its

members would otherwise have standing to sue"; (b) the suit is "germane to the

organization's purpose"; and "(c) neither the claim asserted nor the relief requested

requires the participation of individual members," as is the case here, where "the

association seeks a declaration [or] injunction." *Hunt v. Wash. State Apple Advert.*

*Comm'n*, 432 U.S. 333, 343 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 515

(1975)). Alternatively, an organization may bring a lawsuit on its own behalf

"[when] it show[s] a drain on its resources from both a diversion of its resources

and frustration of its mission'" in response to the alleged unlawful act. *Valle del*

*Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (additions in original)

(quoting *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666

F.3d 1216, 1219 (9th Cir. 2012)).

The Court finds that R-CALF have demonstrated associational standing to bring a lawsuit on behalf of its members against 12 of the 15 QSBCs. Those members pay the Beef Checkoff and object to being associated with speech over which they have no control. (*See* Doc. 90 at 14.) Also, this lawsuit is germane to at least one of R-CALF's purported purposes—"protecting domestic, independent cattle producers." (Doc. 111 at 7.) Finally, the Court finds that neither the claim asserted nor the relief requested requires the participation of individual members.

The Court also finds that R-CALF has satisfied Article III's standing requirements to bring this lawsuit on behalf of itself. As R-CALF points out, neither the Government nor Defendant-Intervenors contest that R-CALF has diverted 60 percent of its resources to attempting to educate producers on the use of checkoff funds by QSBCs. (*See* Doc. 111 at 8; Ex. 56, Doc. 91-3 at 7.) These resources represent funds that could otherwise be spent "protecting domestic, independent cattle producers." That constitutes a diversion of resources sufficient to give R-CALF organizational standing. Further, R-CALF reasonably fears that QSBCs will use funds in a way that fails to protect domestic, independent cattle producers, which would frustrate R-CALF's organizational mission.

The Government takes issue with whether R-CALF has diverted resources and frustrated their mission by bringing this lawsuit. The Government claims that R-CALF's "mission *is* to challenge USDA policies." (Doc. 125 at 14.) And the

resources that R-CALF has diverted to things like this lawsuit only further that mission. According to the Government, an organization cannot "divert" resources from its mission when the organization then uses those resources in a way that serves their mission. (*Id.*) This argument fails because nothing about protecting domestic, independent cattle producers requires R-CALF to fight against QSBCs use of checkoff funds.

Rather than take issue with R-CALF's organizational or associational standing, Defendant-Intervenors challenge whether this lawsuit would redress R-CALF's injuries. This Court rejected a nearly identical argument in its opinion in 2016. *See R-CALF et al. v. Vilsack et al.*, 2016 WL9804600, at *2 (D. Mont. Dec. 12, 2016), *adopted in full*, 2017 WL 2671072, at *4 (D. Mont. June 6, 2017). The case law has not changed since then, and neither does this Court's analysis.

*Redirection*

Since this Court's last ruling, the Government has finalized its "Redirection Rule." *See* 84 Fed. Reg. 20,765, 20,766 (May 13, 2019). This rule formalized USDA's policy of permitting producers to forward their full assessment to the Beef Board. The Government argues in essence that this rule removes any compulsion and thus any First Amendment claim brought by R-CALF must fail.

The Government made similar arguments before this Court when the Redirection Rule was still just USDA policy. USDA has finalized the Redirection

Rule since that time. This Court rejected the Governments arguments related to the Redirection Rule when it was just policy and it has no reason to reconsider that rejection now that it is a final rule. This Court relied on *Knox v. Service Employees International Union*, 567 U.S. 298 (2012). Under *Knox*, opt-out provisions like the one that this Court ruled on previously that has now been finalized as the Redirection Rule violate the First Amendment. Instead, *Knox* requires the Government to obtain affirmative consent before taking funds from individuals for private speech. *See id.* at 322. The Ninth Circuit upheld that ruling, *see R-CALF v. Perdue*, 718 Fed. App'x 541, 543 (9th Cir. 2018), and nothing has happened in the interim that requires this Court to change its analysis.

*Private speech versus government speech*

The First Amendment protects private parties from subsidizing speech that the private party disagrees with. *See Knox*, 567 U.S. at 309. That protection does not extend to subsidizing government speech. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559-560 (2005).  Government speech includes speech from nongovernmental entities in certain circumstances. *See id.* at 560 n.4. Nongovernmental entities make government speech only when the federal government "effectively control[s]" the message of the nongovernment entity. *Id.* at 560; *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 586 F.3d 1219, 1226 (9th Cir. 2009).

8

To effectively control the speech, the message must be "from beginning to end the message established by the Federal Government." *Johanns*, 544 U.S. at 560. In *Johanns*, the Supreme Court provided a general outline of what establishing a message "from beginning to end" looks like. The Court noted that statutes and regulations "specified, in general terms, what the promotional campaign shall contain, and what they shall not." 544 U.S. at 561. The Government may then delegate "development of the remaining details to an entity whose members are answerable to the Secretary (and in some cases appointed by him as well)." *Id.* And government officials "attend and participate in open meetings at which" that development occurs. *Id.* Further and crucially for this case, the Secretary there retained ultimate veto power over the nongovernment entities advertisements, "right down to the wording." *Id.* at 563. Additionally, the Court noted that Congress "retain[ed] oversight authority" and "the ability to reform the program at any time." *Id.* at 563-64. "No more is required" to demonstrate control of a message "from beginning to end." *Id.* at 564.

The Ninth Circuit has not viewed *Johanns* as defining minimum requirements for showing control from beginning to end. For example, in *Paramount Land Company LP v. California Pistachio Commission*, 491 F.3d 1003, 1011-12 (9th Cir. 2007), the Ninth Circuit held that a nongovernment entity created government speech even though the Secretary of Agriculture had less

9

appointment and removal powers over that entities members as compared to the Secretary's appointment and removal powers in *Johanns*.

When determining whether government speech exists, the Ninth Circuit emphasized *effective*, that is, potential control. *See Paramount Land*, 491 F.3d at 1011; *Johanns*, 544 U.S. at 560. A failure to "reject[] or edit[] proposals" or to take a particularly active role in meetings" is "not an indication that the government cannot exercise authority," and does not preclude a Court from ruling that the government effectively controls that speech. *Paramount Land*, 491 F.3d at 1011; *see also Delano Farms*, 586 F.3d at 1230 (noting that the proper test for determining effective control focuses on potential control, "not the actual level of control evidenced in the record"). Instead, the question is whether the government "*retains* authority to control both the activities and the message." *Paramount*, 491 F.3d at 1011.

## General Terms of Promotional Campaigns

Here, statutes and regulations "specif[y], in general terms, what the promotional campaign shall contain, and what they shall not." *Johanns*, 544 U.S. at 561. QSBCs' promotions must "advance the image and desirability of beef and beef products" and may not make "reference to a brand or trade name of any beef product." 7 U.S.C. § 2902(13); 7 C.F.R. § 1260.169(d); *see also Johanns*, 544 U.S. at 561 (quoting these provisions).

10

*Answerability to USDA*

QSBC members remain answerable to USDA through the certification and decertification process. 7 C.F.R. § 1260.181. Through that process the Beef Board, in concurrence with USDA, approves all QSBCs. QSBCs may not obtain checkoff funds without certification. *Id.* The Beef Board can similarly revoke that certification and ability to receive checkoff funding.

R-CALF claims that QSBCs are not answerable to USDA, placing particular importance on the Government's inability to appoint or remove anyone from the QSBCs. R-CALF notes that "*every* entity the Ninth Circuit and Supreme Court [have] held can use compelled subsidies to generate 'government speech'" has had some of its members appointed or removable by the Government. (Doc. 90 at 17-18.)  According to R-CALF, "[i]t makes sense the absence of such authority would be significant" here.

The *presence* of appointment and removal powers proves significant, but the absence of those powers proves quite little. The presence of appointment and removal powers proves significant because appointment and removal of entity members stands as a quite powerful way to ensure that those entities remain answerable to the government. The *absence* of these powers, however, proves insignificant, at least in this case. No Ninth Circuit or Supreme Court opinion has

11

held that appoint and removal stand as the sole way that entities remain answerable to government agencies.

Here, for example, QSBCs remain answerable to USDA through the certification and decertification power, in combination with USDA's pre-approval over all QSBC advertisements. Each board must meet certain certification requirements to receive funding. 7 C.F.R. § 1260.181. With USDA's concurrence, the Beef Board may use its authority to revoke certification for failure to follow USDA requirements. USDA and the Beef Board "retain[] [this] authority" and under *Johanns* that proves sufficient to demonstrate answerability. That USDA has used the decertification authority on at least one occasion only underscores the usefulness of this power.

The certification process only proves useful for making QSBC members answerable to USDA when considered as one part of the whole scheme that USDA uses to control QSBCs' message "from beginning to end." Viewed in isolation, by contrast, the certification power would prove relatively useless for keeping the QSBCs answerable to USDA. In theory, QSBCs could receive certification, then develop their ads, disseminate them, and only then get decertified. But by that time, the damage will have been done to R-CALF and those whose speech was compelled.  Without more, the certification and decertification power do quite little to make QSBCs answerable to USDA without allowing QSBCs to harm R-CALF.

12

When considered as one part of the whole, however, this problem with the certification process disappears. As discussed above, under the MOUs that USDA entered into with QSBCs, USDA now retains complete final approval over all QSBC ads. This final approval gives USDA the option to exercise its authority to decertify a QSBC *before* the QSBC ever gets the chance to disseminate advertisements. The MOUs all but make this explicit. (*See, e.g.*, Doc. 133-1 at 4 ("If at any time [Vermont's QSBC] fails to comply with the terms of this MOU, . . . [USDA] may direct the Beef Board to de-certify [Vermont's QSBC.") That proves enough to make QSBCs "answerable" to USDA.

This Court acknowledges that the certification process makes QSBC members less answerable to USDA than the Beef Board officials in *Johanns*. As noted earlier, however, the Ninth Circuit has not treated any one particular characteristic present with the Beef Board in *Johanns* as a floor that other entities must satisfy. *See Paramount Land*, 491 F.3d 1003 (upholding organization where Secretary of Agriculture had less appointment authority over board members than in *Johanns*).

*Participation in Open Meetings*

Under the MOUs, USDA retains the authority to participate in open meetings. (*See, e.g.*, Doc. 133-1 (noting that Vermont Beef Industry Council must provide USDA with notice of their meetings as well as meeting minutes and

13

additional information related to those meetings as USDA requests).

<em>Final Approval</em>

This Court previously held that USDA did not have effective control because there was no evidence that federal officials either participated in the creation of QSBCs' advertising campaigns or that USDA approved every word of those campaigns. *See R-CALF v. Vilsack*, 2016 WL 9804600, at *5 (D. Mont. Dec. 12, 2016). Simply put, *Johanns* requires control "from beginning to end" and USDA had no control at the end of QSBCs' advertisement process.

Since then, USDA and all QSBCs named in this lawsuit have entered into MOUs that fix this problem. The Court continues to believe its first ruling was correct, even though the Government tangentially claims that it had effective control over the QSBCs' advertising campaigns without the MOUs. (*See* Doc. 99 at 7-8.) The Government's bare assertion carries no weight because it relies exclusively on the MOUs to argue that USDA now retains "final approval authority over every word used in every promotional campaign." (Doc. 99 at 11 (quoting *Johanns*, 544 U.S. at 561).) In other words, USDA relies exclusively on the MOUs to argue that the problem identified by this Court in its first ruling has now been rectified. All fifteen states named in this lawsuit have entered into MOUs with USDA. (*See* Doc. 99 at 9 (Hawaii, Indiana, Kansas, Montana,

14

Nebraska, Nevada, New York, North Carolina, Pennsylvania, South Carolina, South Dakota, Texas, and Wisconsin), Doc. 133 at 2 (Vermont), and Doc. 134 at 2 (Maryland).)  The Court will only reference the MOU with Vermont's QSBC, but the MOUs with the remaining QSBCs prove identical. (*See* Doc. 133 at 2.)

Under the MOUs, Vermont's QSBC agrees to submit to USDA "for pre-approval any and all promotion, advertising, research, and consumer information plans and projects, which [USDA] shall review and approve or reject." (Doc. 133-1 at 3.) Also, Vermont's QSBC agrees "to submit for pre-approval . . . any and all potential contracts or agreements to be entered into by [Vermont's QSBC] for the implementation and conduct of plans or projects funded by checkoff funds." (*Id.*) The MOU gives broad pre-approval authority, without much, if any, limitation. At bottom, QSBCs face the choice of getting USDA approval or not speaking at all. That constitutes final approval of authority "over every word used in every promotional campaign." *Johanns*, 544 U.S. at 561.

R-CALF maintains that the Government does not ensure that QSBCs' speech reflects the Government's views. (Doc. 90 at 20-22.) R-CALF's argument boils down to this: the Government does not take *enough* involvement in the QSBCs' speech.

This argument misconstrues the government speech standard outlined in *Johanns. See Johanns*, 544 U.S. at 563. As discussed above, the test is whether the

government "retains authority" to control the speech, not whether the government actually exercises that authority. So if USDA simply acts as a rubberstamp for QSBC advertisements, that fact proves irrelevant as long as USDA retains the broad authority in the MOUs.

The distinction drawn in *Delano Farms* between actual authority exercised and retained authority makes sense when considering the hallmark of government speech: political accountability. The Courts have held that government speech does not implicate the First Amendments compelled speech protections because "[w]hen the government speaks, . . . it is, in the end, accountable to the electorate and the political process for its advocacy." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). Similarly, a failure to exercise authority to control speech from the QSBC is a failure of USDA, an agency headed by the "Secretary of Agriculture, a politically accountable official." *Johanns*, 544 U.S. at 563. As long as R-CALF complains about a failure to exercise authority, it can rectify that complaint by holding USDA politically accountable. Only if USDA has no authority to exercise in the first place does R-CALF lose the ability to rectify its problems in the political arena.

Finally, R-CALF contends that speech from the QSBCs is private speech because QSBCs present it as private speech. (Doc. 24-27.) The Court addressed and rejected this argument in *Johanns*: "We need not determine the validity of this

16

argument—which relates to compelled speech rather than compelled subsidy—with regard to respondents' facial challenge. Since neither the Beef Act nor the Beef Order requires attribution, neither can be the cause of any possible First Amendment harm." 544 U.S. at 564-65.

*Third-party Organizations*

R-CALF maintains that QSBCs engage in private speech because it funds organizations with checkoff money and neither USDA nor the QSBCs have authority to review what speech is made by those organizations. (Doc. 99 at 22-23.) The Government claims that it need only "exercise effective control over QSBCs when they distribute checkoff dollars, ensuring that those expenditures are authorized by the Beef Act and the Beef Order." They further claim that "there is no separate requirement that USDA exercise effective control of every entity downstream from that disbursement." (Doc. 99 at 19.) The Government counters that no case law requires USDA to exercise control over downstream entities that receive money from QSBCs. (*Id.*)

The Government has the stronger argument. R-CALF offers no rationale to explain why QSBCs may not pay for membership in organizations like the Federation of State Beef Councils or the U.S. Meat Export Federation. To hold otherwise, raises the "risk[] [of] micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake." *Paramount Land*,

17

491 F.3d at 1012. This Court is ill-equipped to parse budget line items from QSBCs to determine whether that particular contribution constitutes a compelled subsidy. To the extent that R-CALF argues that these contributions represent a potential end run around the pre-approval process in the MOUs, those concerns are minimized by USDA's approval of QSBCs budgets.

*Injunction Even Under MOUs*

R-CALF argues that it should receive an injunction even if QSBCs engage in government speech. It argues that under the Ninth Circuit's mootness doctrine that it is "entitled to the protection of an enforceable order to ensure that past [constitutional] violations will not be repeated." (Doc. 111 at 37-38 (quoting *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992)).) The Government maintains first that mootness doctrine doesn't apply because R-CALF would not have standing if this Court finds that QSBCs make government speech. The Government also argues that even under Ninth Circuit's mootness case law that the Government is entitled to greater deference than a private party regarding whether a party can moot a case by changing its actions that caused the alleged constitutional violation. (Doc. 125 at 16-17.)

Assuming R-CALF has standing, R-CALF still has not demonstrated that an injunction would prove necessary at this point. A party may receive an injunction in a moot case "where there is 'no reasonable . . . expectation that the alleged

18

violation will recur,' and where 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1179 (9th Cir. 2010) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)); *see Barnes*, 980 F.2d at 580 (citing the same standard as outlined in *Davis*). But mootness does not treat private parties and the government equally. Courts have routinely given government agencies greater leniency when considering whether the party may resume its illegal or unconstitutional activities. *See Am. Cargo Transp., Inc.*, 625 F.3d at 1180 (collecting cases). The Court sees no reason here to assume the Government entered these MOUs as merely a way to avoid an adverse result in this Court.

## Motion to Strike

R-CALF also moved to strike both Defendant-Intervenors' and the Government's individual Responses to Plaintiff's Statement of Undisputed Facts ("RSUFs"). (Doc. 114 (seeking to strike portions of Doc. 97 and Doc. 101).) The Court has recommended resolving this case at the summary judgment stage. In doing so, the Court decided which facts were material and whether those material facts were in dispute. R-CALF's motion proves moot.

## RECOMMENDATIONS

Accordingly, this Court **RECOMMENDS** that the district court:

1.  Plaintiff's motion for summary judgment (Doc. 89) should be **DENIED**;

2.  Plaintiff's motion to strike (Doc. 114) should be **DENIED**, as moot;

3.  Defendant Sonny Perdue, in his official capacity as Secretary of Agriculture, and the United States Department of Agriculture's cross motion for summary judgment (Doc. 98) should be **GRANTED**;

4.  Defendant-Intervenors Montana Beef Council, et al.'s cross motion for summary judgment (Doc. 94) should be **GRANTED**.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof. 28 U.S.C. § 636. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed. R. App. P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 29th day of January, 2020.

John Johnston
United States Magistrate Judge