**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA, | **CV-16-41-GF-BMM** |
| Plaintiff, | |
| vs. | **ORDER ADOPTING FINDINGS AND RECOMMENDATIONS** |
| SONNY PERDUE, in his official capacity as Secretary of Agriculture, and the UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Defendants, | |
| vs. | |
| MONTANA BEEF COUNCIL, et al. | |
| Defendant-Intervenors. | |

**Introduction**

This Court answered the exact question now before it nearly three years ago when it adopted Magistrate Judge John Johnston's findings and recommendations to grant a preliminary injunction in favor of Plaintiffs on the basis that the federal Beef Checkoff Program violated the First Amendment. This Court adopted

1

Magistrate Judge Johnston's findings in full. The Ninth Circuit affirmed. As this litigation wound its way from the Magistrate Judge to the Ninth Circuit, the United States Department of Agriculture ("USDA") began entering into memorandums of understanding with a number of qualified state beef councils that remain parties to this litigation. These memorandums gave USDA broad new authority over any potential speech that the beef councils might produce. The parties all filed motions and cross motions for summary judgment.

Magistrate Judge Johnston reversed course and now recommended granting summary judgment in favor of Defendants and Defendant-Intervenors. He outlined why the memorandums of understanding—which no beef council had entered until after Magistrate Judge Johnston had issued his first findings and recommendations—provided sufficient control of qualified state beef councils' speech for that speech to qualify as government speech and thus not run afoul of the First Amendment. All parties objected in full, or in part, to Magistrate Judge Johnston's Findings and Recommendations. And so, three years after having answered this question once before, this Court faces the questions of whether the federal Beef Checkoff Program violates the First Amendment.

## Standard of Review

The Court reviews de novo findings and recommendations to which the parties make objections. 28 U.S.C. § 636(b)(1). No review is required of proposed

2

findings and recommendations to which no objection has been made. *Thomas v. Arn*, 474 U.S. 140, 149-152 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## Background

Congress passed The Beef Promotion and Research Act of 1985 ("Beef Act") "to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets." 7 U.S.C. § 2901(b). To accomplish this goal, Congress imposed a $1 assessment, or "checkoff," on cattle producers for each head of cattle sold in the United States. *See id.* The checkoff would fund beef-related promotional campaigns. Congress also created the Beef Board and Beef Promotion Operating Committee to run the checkoff program and assist in crafting the research and promotion plans undertaken with checkoff funds. 7 U.S.C. § 2904(1)-(5); *see also* 7 C.F.R. §§ 1260.141, 1260.161.

While Congress created this federal program to strengthen the beef industry, it also recognized that "State and national organizations [already] conduct[ed] beef promotion, research, and consumer education programs that [were] invaluable to the efforts" of maintaining beef markets. 7 U.S.C. § 2901(a)(5). So Congress gave these state entities a role to play in this new beef-market-strengthening regime by allowing qualified state beef councils ("QSBCs") to collect the checkoff

assessments on behalf of the Beef Board. *See* 7 C.F.R. § 1260.172(a)(2). QSBCs

must receive certification from the Beef Board before they may collect

assessments. *See id.* § 1260.181(a). In certain limited circumstances, the Beef

Board may decertify QSBCs. (*See* Doc. 40-1 (Payne Declaration) ¶ 29 (citing 7

C.F.R. § 1260.181).)

QSBCs that collect the checkoff funds may retain $0.50 to fund its own

promotional activities. It must send the remaining $0.50 to the Beef Board. 7

U.S.C. § 2904(8)(C); 7 C.F.R. § 1260.172(a)(3). This process operates as the

default payment for checkoff funds. Producers, if they so choose, can opt-out under

the "Redirection Rule" of paying QSBCs any of their assessment. This rule allows

producers to "request a redirection of assessments from a Qualified State Beef

Council to the Board" by "submitting a redirection request." 7 C.F.R. §

1260.172(a)(7). QSBCs agree that any such requests "will be honored" as a

condition of certification. *Id.* § 1260.181(b)(8).

QSBCs may only uses checkoff funds in a limited manner. QSBCs may only

engage in promotional activities that "strengthen the beef industry's position in the

marketplace." 7 C.F.R. § 1260.181(b)(1); *see* 7 C.F.R. § 1260.169 (defining

activities that QSBCs may conduct under § 1260.181(b)(1) to include "projects for

promotion" of the beef industry). At the same time, QSBCs must certify that they

will not use any of the money that they receive under the Beef Checkoff Program

to promote "unfair or deceptive" practices, or to "influenc[e] governmental policy." 7 C.F.R. § 1260.181(b)(7).

On top of these limits, QSBCs have begun entering into Memoranda of Understanding ("MOU") that give USDA significant discretion to approve or reject any and all QSBC promotional activities. Under the MOUs, QSBCs agree to submit to USDA "for pre-approval any and all promotion, advertising, research, and consumer information plans and projects." (Ex. 18, Doc. 91-1 at RCALF_000045.) QSBCs also must provide USDA with advance notice of any QSBC board meetings and allow a USDA official to attend. (*Id.*) USDA may "direct the Beef Board to de-certify" the QSBC if the QSBC fails to comply with the MOU. (*Id.* at RCALF_000046.) Decertified QSBCs cannot receive checkoff funds. (*Id.*)

## I.    R-CALF Possesses Article III Standing

Magistrate Judge Johnston determined that R-CALF had Article III standing to bring this lawsuit. (Doc. 135 at 4-7.) Article III limits courts to deciding "cases" or "controversies." *See* U.S. Const. art. III. Courts have distilled the case or controversy requirement into a familiar three-part test—injury-in-fact, causation, and redressability. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 102-03 (1998). As the party invoking the court's jurisdiction, R-CALF bears the burden of proof for each element. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Organizations can invoke a court's jurisdiction by demonstrating a few additional elements on top of the typical three. These additional requirements differ depending on whether the organization brings the lawsuit on behalf of itself or its members. To bring a lawsuit on behalf of its members, the organization must demonstrate that "(a) its members would otherwise have standing to sue;" (b) the suit is "germane to the organization's purpose;" and "(c) neither the claim asserted nor the relief requested requires the participation of individual members," as is the case here, where "the association seeks a declaration [or] injunction." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). An organization may bring a lawsuit on its own behalf "[when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission'" in response to the alleged unlawful act. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (additions in original) (quoting *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012)).

Magistrate Judge Johnston found that R-CALF had demonstrated associational standing to bring this lawsuit on behalf of itself against all of the QSBCs and on behalf of its members against 12 of the 15 QSBCs. (Doc. 135 at 6-7.) No party objected to this part of Magistrate Judge Johnston's analysis.

Although they do not object to Magistrate Judge Johnston's findings about organizational standing, Defendant-Intervenors object to whether R-CALF has satisfied the redressability prong of Article III standing. (Doc. 138 at 2-8.) Magistrate Judge Johnston rejected Defendant-Intervenors' argument about redressability because this Court had "rejected a nearly identical argument in its opinion in 2016" and nothing since then would have changed Magistrate Judge Johnston's analysis. (Doc. 135 at 7.)

Defendant-Intervenors object to Magistrate Judge Johnston's findings in five ways. They seem to argue that Magistrate Judge Johnston contradicted himself because he ruled that QSBCs "were engaged in *government speech*" and thus this Court could not offer any redress. This argument impermissibly collapses the Court's standing analysis with its merits analysis. Plaintiffs only fail to satisfy the redressability prong if they cannot receive a remedy redressing their injury *even if they win*. Of course this Court cannot offer Plaintiffs a remedy that would redress their injuries when Plaintiffs lose on the merits (i.e. whether QSBCs make government speech). This conclusion does not preclude Plaintiffs from receiving a remedy that would redress their injuries had Plaintiffs prevailed on the merits. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (collecting cases that distinguish between standing and the merits).

Defendant-Intervenors also argue that the Court cannot redress R-CALF's injury because R-CALF wants "the Beef Checkoff program to differentiate between foreign and domestic beef." (Doc. 138 at 2.) This objection fails because it largely ignores—and does not preclude—Magistrate Judge Johnston's finding regarding standing. Magistrate Judge Johnston found that R-CALF had standing because one of R-CALF's purported purposes was "protecting domestic, independent cattle producers." (Doc. 135 at 6 (quoting Doc. 111 at 7).) R-CALF has been injured by diverting resources from protecting domestic, independent cattle producers to fighting this alleged First Amendment violation. (*See id.*) The Court could redress R-CALF's injury by an injunction preventing the alleged First Amendment violation.

Whether R-CALF wants the Beef Checkoff program to differentiate between foreign and domestic beef proves irrelevant to Magistrate Judge Johnston's analysis. Defendant-Intervenors' objection would only preclude R-CALF from showing that it had standing if Magistrate Judge Johnston had found that R-CALF's injury arose from the Beef Checkoff program's failure to differentiate between foreign and domestic beef. His analysis did no such thing.

Defendant-Intervenors other three objections relate to whether R-CALF has suffered injury by diverting resources. First, they claim that R-CALF cannot have standing because R-CALF has not shown that "its lack of success [lobbying]

Congress and the Executive Branch was due to a lack of resources." (Doc. 138 at 5.) This argument would place a requirement on organizations not mandated by Ninth Circuit case law. R-CALF does not need to show that it will lobby Congress and the Executive Branch successfully; it only needs to show that it will be able to undertake *more* lobbying of Congress and the Executive Branch in the absence of the alleged First Amendment violation. R-CALF has done so.

Defendant-Intervenors make two separate, but related arguments, that both suffer from the same flaw: they simply ignore without explanation Magistrate Judge Johnston's findings that R-CALF has diverted resources to fight this alleged First Amendment violation. Defendant-Intervenors maintain that R-CALF "cannot manufacture . . . injury [to itself] by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." (*Id.* at 6 (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).) Defendant-Intervenors then argue based on a recent decision, *Humane Soc'y v. Perdue*, 935 F.3d 598, 601-04 (D.C. Cir. 2019)), that R-CALF must have more than a "mere interest in a problem or an ideological injury." (*Id.* at 6 (quoting *Humane Soc'y*, 935 F.3d at 604 (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)))).) The thrust of both arguments strikes at a fundamental principle underlying standing doctrine: Plaintiffs must have a "personal stake in the outcome" of a lawsuit. *Baker v. Carr*,

369 U.S. 186, 205 (1962); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 101

(1983). Both of Defendant-Intervenors' arguments maintain in different ways that

R-CALF lacks a personal stake in this litigation.

Both of these arguments fail because they ignore Magistrate Judge

Johnston's findings regarding the personal stake that R-CALF has in this litigation,

namely the diversion of its resources. As Magistrate Judge Johnston correctly

pointed out, R-CALF has diverted resources to educate producers on the use of

checkoff funds by QSBCS—the alleged problem central to this case that would

undercut R-CALF's purpose of protecting domestic, independent cattle producers

if let unaddressed. (*See* Doc. 135 at 6.) Thus, R-CALF is not attempting to solve a

problem that would otherwise not affect it, but instead attempting to address a

problem that would directly undercut its entire purpose. The diversion of resources

also proves that R-CALF has not alleged some "mere interest in a problem," but

rather has alleged a problem and the specific way that problem impacts R-CALF.

Neither of Defendant-Intervenors arguments proves availing absent some sort of

explanation about why R-CALF has not diverted 40 percent of its resources.

## II.  QSBCs Do Not Conduct Government Speech in the Absence of the MOUs

Magistrate Judge Johnston noted that "the Government tangentially claims

that it had effective control over the QSBCs' advertising campaigns without the

MOUs." (Doc. 135 at 14.) Magistrate Judge Johnston endorsed this Court's first ruling, which address the same factual scenario now before the Court with the exception of the MOUs. (*Id.*) The Government objects to this finding. This Court has no reason to doubt its analysis from its first decision in this case, as the Ninth Circuit affirmed. *See R-CALF v. Perdue*, 718 F. App'x 541 (9th Cir. 2018). The Court rejects the Government's objection on this issue.

### III.    QSBCs Conduct Government Speech Under the MOUs

The First Amendment protects private parties from subsidizing speech with which the private party disagrees. *See Knox*, 567 U.S. at 309. No such prohibition applies to government speech, though. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559-560 (2005). Government's remain accountable to its constituents for any speech with which those constituents disagree; the same is not true of private speech. *See id.* at 563.

That said, private organizations may still make speech that falls within the definition of government speech. *See id.* at 560 n.4. Private organizations make government speech only when the federal government "effectively control[s]" the message of the nongovernment entity. *Id.* at 560; *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 586 F.3d 1219, 1226 (9th Cir. 2009).

The Supreme Court has given a general description of what government speech looks like in the context of checkoff funded organizations. The federal

11

government must control the speech "from beginning to end." *Johanns*, 544 U.S. at 560. The Supreme Court has considered a number of factors when determining if speech by a checkoff funded entity qualifies as government speech. The Court considered whether statutes and regulations "specified, in general terms, what the promotional campaign shall contain, and what they shall not." *Id.* at 561. The Government may then delegate "development of the remaining details to an entity whose members are answerable" to the government. *Id.* Whether government officials may "attend and participate in open meetings at which" that development occurs also proves relevant to the analysis. *Id.* Finally, the government must retain ultimate veto power over the private organization's advertisements, "right down to the wording." *Id.* at 563.

The Ninth Circuit has recognized two critical considerations when applying *Johanns*. First, the focus in a *Johanns* analysis must be on potential control, rather than actual control exercised. *See Paramount Land Company LP v. California Pistachio Commission*, 491 F.3d 1003, 1011 (9th Cir. 2007); *see also Johanns*, 544 U.S. at 560. Second, "*Johanns* did not set a floor or define minimum requirements." *Paramount Land*, 491 F.3d at 1011.

Magistrate Judge Johnston made two findings related to the factors outlined in *Johanns* to which no party has objected. The Court has reviewed Magistrate Judge Johnston's findings regarding the general terms of promotional campaigns

and participation in QSBC board meetings. The Court agrees with Magistrate

Judge Johnston's findings and will adopt them.

*A. Answerability to USDA*

Magistrate Judge Johnston found that QSBC members remain answerable to

USDA through the certification and decertification process. 7 C.F.R. § 1260.181.

Through that process the Beef Board, in concurrence with USDA, approves all

QSBCs. QSBCs may not obtain checkoff funds without certification. *Id.* The Beef

Board similarly can revoke that certification and ability to receive checkoff

funding.

Magistrate Judge Johnston rejected R-CALF's argument that the QSBCs

only remain answerable to the Government if the Government appoints some or all

of their members. R-CALF noted that every board previously approved by a court

as making government speech had one or members who were appointed by the

Government. Magistrate Judge Johnston noted that the "*presence* of appointment

and removal powers proves significant, but the absence of those powers proves

quite little." (Doc. 135 at 11.) He continued by stating that appointment and

removal stand as strong ways to ensure answerability, but hardly the only way.

(*Id.*) Magistrate Judge Johnston emphasized that "under the MOUs . . . , USDA

now retains complete final approval over all QSBC ads. This final approval gives

USDA the option to exercise its authority to decertify a QSBC *before* the QSBC ever gets the chance to disseminate advertisements." (Doc. 135 at 13.)

R-CALF now objects to Magistrate Judge Johnston's findings related to the appointment and removal of QSBC board members. R-CALF does not cite a single case that explicitly states that boards like QSBCs that receive checkoff funds must have at least some members appointed and potentially removed by the Federal Government. R-CALF instead claims that because "any party had some or all of its members appointed and likely subject to remove by the government" in other government speech cases, QSBCs cannot undertake government speech unless at least one of their members is appointed and likely subject to removal by the Government. (Doc. 139 at 20-23.) R-CALF then claims that the absence of appointment and removal of QSBC members makes QSBC speech "inconsistent with the premise of 'government speech': that the First Amendment need not apply because there is 'democratic accountability' for the speech." (*Id.* at 22 (quoting *R-CALF II*, 2017 WL 2671072, at *5).)

This argument borders on frivolous as *Paramount Land* explains. There the government appointed one member of the nine-member board. The government also could suspend or discharge the board's president and must "concur in any nomination and election procedures." *Paramount Land*, 491 F.3d at 1010. The Court fails to see what practical difference as related to democratic accountability

could possibly exist between the board in *Paramount Land* and QSBCs here due to the appointment of one member of a nine-member board. And as R-CALF acknowledges in a different part of its brief, "if a court is sure the speech 'is from beginning to end the message established' by the government[,] it should not 'draw a line between' minor differences in satisfying that requirement." (Doc. 139 at 17 (quoting *Paramount Land*, 491 F.3d at 1011-12).) Certainly, the difference between a board with one out of nine members and a board with zero members appointed by the Government proves minor here.

What is more, courts have upheld checkoff funded entities' speech as government speech even when the Government possessed limited appointment power. The United States Supreme Court approved the Beef Board even though the Government could only appoint people from a list of candidates nominated by the trade associations. The Government was further limited by the requirement that the members must be a geographically representative group of beef producers and importers. *See Johanns*, 544 U.S. at 553. As the Ninth Circuit pointed out in *Paramount Land*, both the Beef Board and the board at issue in *Paramount Land* were "dominated by industry appointees, not independent third party board members." 491 F.3d at 1010 n.4.

Given the Ninth Circuit's directive that "*Johanns* did not set a floor or define minimum requirements," this Court agrees with Magistrate Judge Johnston that the

lack of appointment and removal power proves quite insignificant here. *Id.* at 1011. Rather, the focus must remain on answerability to the government, and Magistrate Judge Johnston's findings and recommendations correctly outline why QSBCs remain answerable to USDA even in the absence of appointment and removal power. The Court rejects R-CALF's objections on this issue.

## B. *Final Approval*

Magistrate Judge Johnston ultimately found that USDA now exercises final approval over all QSBC advertisements. Magistrate Judge Johnston relied on the MOUs between QSBCs and USDA. (Doc. 135 at 14-15.) Under the MOUs, QSBCs agree to submit to USDA "for pre-approval any and all promotion, advertising, research, and consumer information plans and projects, which [USDA] shall review and approve or reject." (Doc. 133-1 at 3.) The QSBCs also agree "to submit for pre-approval . . . any and all potential contracts or agreements to be entered into by [a QSBC] for the implementation and conduct of plans or projects funded by checkoff funds." (*Id.*) Magistrate Judge Johnston concluded that the "MOUs gives broad pre-approval authority, without much, if any, limitation. At bottom, QSBCs face the choice of getting USDA approval or not speaking at all." (*Id.* at 15.)

R-CALF objects to Magistrate Judge Johnston's findings and recommendations on the basis that Magistrate Judge Johnston allegedly made both

legal and factual error. R-CALF claims that Magistrate Judge Johnston legally erred because under *Matal* private speech cannot "be passed off as government speech by simply affixing a government seal of approval." (*Id.* (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017)).) R-CALF claims that this quote, and *Matal* as a whole, show that Magistrate Judge Johnston incorrectly focused on potential, rather than actual, level of control.

*Matal* hardly undercuts Magistrate Judge Johnston's analysis. There the potential control the Government could exercise amounted to little more than a rubber stamp. The Government could not inquire into whether "any viewpoint conveyed by a mark is consistent with Government policy" and was required to register trademarks if, in essence, a list of requirements had been met. The Government had almost no discretion. *See Matal*, 137 S. Ct. at 1758.

In the absence of discretion to approve or reject speech, the hallmark of government speech—political accountability—disappears. If USDA had no discretion under the MOUs to approve or reject QSBC speech, R-CALF would have no political recourse when it saw advertisements with which it disagreed. That would fundamentally make QSBC speech private speech. USDA has significantly more discretion, however, to approve or reject speech than the government agency in *Matal*.

17

Here, as Magistrate Judge Johnston pointed out, USDA enjoys significant discretion to approve or reject QSBC speech. Under the MOUs, USDA will review, and approve or reject, all promotions, advertising, research, and consumer information plans and projects. (*See* Doc. 133-1 at 2.) Nothing in the MOUs limits USDA's ability to approve QSBC speech as it sees fit. Thus, anytime R-CALF sees a QSBC ad that it dislikes, it may lobby USDA, who has the discretion to approve or reject similar ads in the future.

This analysis raises the question of R-CALF's alleged factual error. Although unclear in its brief, R-CALF appears to claim that Magistrate Judge Johnston made a factual error by crediting USDA with more authority to review QSBC speech than USDA has under the MOUs. (*See id.* at 24-26.) R-CALF relies on guidelines provided to QSBCs outlining considerations that USDA will make when evaluating QSBC speech. (Exhibit 19, Doc. 91-1 at RCALF_000760.) R-CALF paints these guidelines as putting drastic limits on USDA's review of QSBC speech. A closer review of the guidelines proves otherwise.

The guidelines retain much of the discretion that USDA retains under the plain terms of the MOUs. The guidelines reiterate that QSBCs may not place advertisements "prior to [USDA] approval." (*Id.*) The guidelines further note that USDA involvement will require "much analysis" and the guidelines only encompass USDA's considerations "[a]s much as possible." (*Id.*) USDA will

consider how and where marketing proposals will be used, how they will be distributed, and who is the target audience. (*Id.* at RCALF_000763.) Critically, and notably absent from R-CALF's argument, USDA will consider "the overall takeaway or net impression" of any marketing proposal. (*Id.*) USDA identifies the overall takeaway or net impression as a "Key Point[]" of its consideration. On top of that, USDA will ensure that "[a]ll statements and depictions [are] appropriate for all audiences and [are] appropriate for the Secretary of Agriculture and all other USDA employees to make." (*Id.* at RCALF_000775.)

All of these considerations indicate that USDA retains significant discretion to approve or reject QSBC speech, even under the guidelines on which R-CALF relies. R-CALF takes significant liberties with how it characterized these guidelines in its objections. Its objection that Magistrate Judge Johnston made factual error cannot withstand much scrutiny based upon the text of the Guidelines. The Court will adopt Magistrate Judge Johnston's findings regarding whether USDA retains enough authority over QSBC speech such that QSBC speech constitutes government speech.

**IV.  Attribution of the Speech to Private Parties Does Not Per Se Transform Government Speech to Private Speech**

Relying on *Johanns*, Magistrate Judge Johnston rejected R-CALF's argument that QSBCs' speech is private speech because QSBCs present it as

19

private speech. (Doc. 135 at 16-17.) Magistrate Judge Johnston noted that *Johanns* addressed and rejected R-CALF's argument on this front (*Id.*)

R-CALF now claims that more recent government speech decisions state that "part of the government speech analysis is whether viewers" believe it is the government doing the speaking. (Doc. 139 at 26.) R-CALF relies on various cases that dealt with government speech issues, although none of those cases dealt with checkoff funds. (*Id.* (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015) (en banc), *aff'd Matal*, 137 S. Ct. 1744 (2017)).)

A number of concerns give this Court pause to adopt R-CALF's proposed reasoning. To start, even R-CALF acknowledges that if this Court adopted the reasoning that R-CALF suggests, then how the speech was attributed would represent only a "part" of the analysis. (Doc. 139 at 26.) Every factor under *Johanns* weighs in favor of finding that QSBCs conduct government speech. Second, the Court in *Johanns* expressed concern regarding attribution only if the alleged speech were associated with the parties who are now in R-CALF's position. *See Johanns*, 544 U.S. at 564 n.7 ("[R]espondents enjoy no right not to fund government speech . . . whether or not the reasonable viewer would identify the speech as the government's. If a viewer would identify the speech as

20

*respondents'*, however, the analysis would be different.") R-CALF does not allege that QSBCs attribute the speech to R-CALF.

Finally, R-CALF has cherrypicked convenient portions of analyses from cases that did not involve checkoff programs. The Ninth Circuit and United States Supreme Court have spoken when it comes to determining whether a checkoff program constitutes government speech. All of the cases that R-CALF cites, in turn, cite *Johanns* at various points. None of the cases explicitly discuss, however, amending, overruling, or superseding *Johanns*. Indeed, *Matal* discusses *Johanns*, *Summum*, and *Walker* and the different reasonings of each, implicitly acknowledging that the government speech analysis may look different when considering different types of speech. Absent the United States Supreme Court and Ninth Circuit saying otherwise, this Court will continue to determine whether checkoff programs constitute government speech by applying the factors as outlined in *Johanns*.

## V.    Third-party Organizations

Magistrate Judge Johnston also rejected R-CALF's arguments that QSBCs violate the First Amendment by providing funds to third-party entities, who may then use those funds to make advertisements. Magistrate Judge Johnston rejected R-CALF's argument because doing otherwise would run the "risk[] [of] micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped

to undertake." (Doc. 135 at 17-18 (quoting *Paramount Land*, 491 F.3d at 1012).) Magistrate Judge Johnston also noted that USDA would be better suited than a federal district court to "parse budget line items" and remedy any potential abuse of third-party funds by QSBCs. (*Id.* at 18.)

R-CALF objects to Magistrate Judge Johnston's findings regarding third-party use of QSBC funds. R-CALF claims that the Government must have complete control over speech from third-parties who receive money from QSBCs just as the Government has complete control of QSBC speech. (Doc. 139 at 16.) According to R-CALF, however, the only limit on third-party speech by entities that receive QSBC funds is that they must comply with the Beef Act and Order. (*Id.*) And compliance with the Beef Act and Order" cannot satisfy *Johanns*' requirements for government speech. (*Id.* at 16-17.) R-CALF then claims that under "the F&R's logic, a private state council can create another private entity, transfer checkoff money to it to fund its speech, and thereby evade the First Amendment's prohibitions . . . . The Constitution cannot be satisfied through such a shell game of corporate forms." (*Id.* at 20.)

R-CALF suggests that this Court can remedy the situation simply by ordering "checkoff money only be spent if the Government can pre-approve the speech." (*Id.* at 18.) Things do no prove so simple. A slight twist on R-CALF's own hypothetical proves why. Say, for instance, that a QSBC used checkoff funds

to pay for a membership in an organization. And that organization used its membership dues to pay for advertisements that complied with the Beef Order and Act. What then? How would R-CALF's proposed remedy solve the problem if the QSBC had no ability to control how this third-party used the QSBC's membership dues? What if this third-party transferred all membership dues to another third-party? How does the QSBC track what happens to its membership due once it pays the third-party? How does R-CALF's proposed remedy resolve any of these issues?

Magistrate Judge Johnston's analysis did not create this shell game but simply acknowledged that USDA stood best suited to remedy any shell game that does exist. USDA possesses experience and expertise in dealing with QSBCs and their budgets that this and all federal district courts lack. Further, as the Government notes, R-CALF continues to offer no authority for the proposition that the government must control all speech by any third-party entity that receives payments for goods and services from a commodity-marketing board." (Doc. 143 at 17.) In the absence of controlling case law saying otherwise, this Court will not impose that requirement on QSBCs.

## VI.    R-CALF Cannot Receive an Injunction

R-CALF unsuccessfully claimed before Magistrate Judge Johnston that it should receive an injunction even if QSBCs conducted government speech. In

recommending against R-CALF, Magistrate Judge Johnston noted that a party may receive an injunction in a moot case "where there is 'no reasonable . . . expectation that the alleged violation will recur,' and where 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1179 (9th Cir. 2010) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)); *see Barnes*, 980 F.2d at 580 (citing the same standard as outlined in *Davis*). Governments receive greater deference than private parties when it comes to whether events have completely and irrevocably eradicated the effect of the alleged violation. *See Am. Cargo Transp., Inc.*, 625 F.3d at 1180 (collecting cases). Magistrate Judge Johnston saw no reason to doubt that the Government had completely and irrevocably cured the alleged violation, and neither does this Court.

R-CALF objects to Magistrate Judge Johnston's recommendation that R-CALF not receive an injunction. R-CALF claims that even though the Government receives greater deference than a private party, the Government still must show that any changes are "entrenched" or "permanent." (Doc. 139 at 28 (quoting *Fikre v. FBI*, 904 F.3d 1033, 1037-38 (9th Cir. 2018)).) R-CALF further claims that the Government fails here because the MOUs here are revocable. (*Id.*)

This Court remains unpersuaded by R-CALF's objections for two reasons. First, the Government has entered into MOUs with QSBCs uninvolved in this

litigation. (Statement of Undisputed Facts, Doc. 100 ¶ 57.) The involvement of QSBCs not involved in this litigation indicates that the Government has enacted a broader policy change, not a change with the sole aim of ending this litigation. Further, the Government may only revoke the MOUs with the consent of the QSBCs. (*See, e.g.*, Doc. 133-1 at 3.) Given this Court's initial order and the Ninth Circuit's affirmance, the QSBCs face the choice of operating under the MOU or consenting to withdrawal of the MOU and losing their checkoff funding. These considerations prove sufficient to show that the MOUs stand "entrenched" in the way that USDA and QSBCs make use of checkoff funds. *See Fikre*, 904 F.3d at 1037-38. The Court denies R-CALF's request for an injunction.

## VII.   Redirection Rule

Magistrate Judge Johnston found that the Government's finalization of the Redirection Rule failed to remedy the compelled subsidy problem of which R-CALF complains. (Doc. 135 at 7-8.) Magistrate Judge Johnston relied almost exclusively on this Court's previous analysis rejecting the Redirection Rule when the rule represented only a policy. The Government objects to Magistrate Judge Johnston's findings. Having reviewed *de novo*, this Court agrees with Magistrate Judge Johnston that nothing has happened since this Court last addressed the Redirection Rule that would change its analysis. The Court rejects the Government's objections.

## VIII.  R-CALF's First Motion to Strike (Doc. 114)

No party objected to Magistrate Judge Johnston's recommendation regarding R-CALF's motion to strike (Doc. 114). Reviewing for clear error and finding none, this Court will adopt Magistrate Judge Johnston's recommendation and deny R-CALF's motion to strike as moot.

## IX.  R-CALF's Second Motion to Strike (Doc. 144)

R-CALF filed a motion to strike Defendant-Intervenor's Response to R-CALF's objections. The Court generally tends to agree with the idea behind R-CALF's brief that Defendant-Intervenors have on numerous occasions stretched legal principles and factual findings at or near their limits. That said, the Court need not strike their responses; this Court knows when a party mischaracterizes a legal principle or factual finding. R-CALF's motion is denied.

## ORDER

Accordingly, **IT IS ORDERED** that Magistrate Judge John Johnston's Findings and Recommendations (Doc. 135) are **ADOPTED IN FULL**:

1. Plaintiff's motion for summary judgment (Doc. 89) is **DENIED**;

2. Plaintiff's motion to strike (Doc. 114) is **DENIED**, as moot;

3. Defendant Sonny Perdue, in his official capacity as Secretary of Agriculture, and the United States Department of Agriculture's cross motion for summary judgment (Doc. 98) is **GRANTED**;

4.  Defendant-Intervenors Montana Beef Council, et al.'s cross motion for summary judgment (Doc. 94) is **GRANTED**.

Further, Plaintiff's motion to strike (Doc. 144) is **DENIED**, as moot.

DATED this 27th day of March, 2020.

Brian Morris, Chief District Judge
United States District Court