**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA, a Montana Corporation, | **CV-16-41-GF-BMM-JTJ** |
| Plaintiffs, | |
| vs. | **ORDER** |
| TOM VILSACK, in his official capacity as Secretary of Agriculture, and the UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Defendants. | |

**INTRODUCTION**

Plaintiff Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of America ("R-CALF") moves the Court under the Equal Access to Justice Act ("EAJA"), for attorney fees and litigation costs incurred in procuring a preliminary injunction against the Government-Defendants, United States Department of Agriculture and Secretary of Agriculture Sonny Perdue (collectively "USDA"). (Doc. 152 at 2 (citing 28 U.S.C. §§ 2412(a)(1), (d)(1)(A)).

**BACKGROUND**

The Food Security Act of 1985, 7 U.S.C. § 2901 *et seq.* ("Beef Act"), and

the Beef Promotion and Research Order, 7 C.F.R. Part 1260, require cattle

producers to pay a "checkoff" assessment on each head of cattle sold in, or

imported into, the United States. The checkoff assessments are used for promotion

and research to strengthen the domestic beef industry. 7 U.S.C. § 2901(b). The

Cattlemen's Beef Promotion and Research Board ("Beef Board") administers

programming funded by the checkoff assessments. 7 U.S.C. §§ 2904(1)–(5); 7

C.F.R. §§ 1260.141, 1260.161.

The Beef Board certifies qualified state beef councils ("QSBC"s), which

may be private entities organized and operated within a state or may be entities

authorized by state statute. QSBCs may collect the checkoff assessments on the

Beef Board's behalf. 7 U.S.C. § 2904(8); 7 C.F.R. § 1260.172(a).

The Beef Act implements a "credit policy" that permits producers to allot

half of their federal checkoff assessment to their respective QSBC to support state

promotional programming. 7 U.S.C. § 2904(8)(C); 7 C.F.R. § 1260.172(a)(3). In

practice, QSBCs implement this credit policy by collecting the full federal

checkoff assessment, retaining $0.50 of every checkoff dollar collected, and

forwarding the remainder to the Beef Board. Some states require producers to

contribute half of their assessment to the QSBC. Producers who reside in states

without a participation requirement may elect into the credit policy and send their checkoff assessment to their QSBC to be divvied accordingly. Those producers who decline to participate in the credit policy direct their full checkoff assessment amount to the national Beef Board. *See* 7 C.F.R. §§ 1260.172(a)(6), (7), 1260.181(b)(8).

USDA holds limited statutory and regulatory authority over QSBCs' use of checkoff funds. USDA permits QSBCs to engage in promotional activities that "strengthen the beef industry's position in the marketplace." 7 C.F.R. § 1260.181(b)(1); *see also* 7 C.F.R. § 1260.169 (defining activities that QSBCs may conduct under § 1260.181(b)(1) to include "projects for promotion" of the beef industry). QSBCs must certify, however, that they will not use any of the money received from checkoff assessments to promote "unfair or deceptive" practices, or to "influenc[e] governmental policy." 7 C.F.R. § 1260.181(b)(7).

R-CALF represents domestic cattle producers in Montana. (Doc. 47 at 7). R-CALF disapproved of Montana's privately held QSBC ("Montana Beef Council") and its advertising campaigns because those campaigns failed to distinguish between domestic beef and foreign beef. R-CALF wanted Montana Beef Council to promote only domestic beef. *Id.* On May 2, 2016, R-CALF brought an as-applied First Amendment challenge to USDA's checkoff assessment credit policy. (Doc. 1).

3

R-CALF claimed that its members were required to subsidize private speech with which they disagreed, in plain violation of the First Amendment. *Id.* R-CALF alleged that checkoff assessment proceeds, taken by private QSBCs and used to pay for private speech, was an unconstitutional government-compelled subsidy of speech. *Id.* R-CALF argued that the checkoff assessment program, and QSBC credit policy, constituted a tax on producers that proves "unconstitutional under any level of scrutiny" to the extent it funds private speech. *R-CALF v. Perdue*, 2017 WL 2671072, at *7 (D. Mont. June 21, 2017). R-CALF contended that Montana Beef Council's speech was not "government speech," which would fall outside of First Amendment protections, because it "lack[ed] the central hallmark of government speech: it [was] in no way controlled or approved by the government." (Doc. 1 at 5).

USDA filed a Motion to Dismiss, a Motion to Dismiss for Failure to State a Claim, and a Motion to Stay on August 4, 2016. (Doc. 19). R-CALF filed a Motion for Summary Judgment or in the Alternative for a Preliminary Injunction on August 24, 2016. (Doc. 21). The Court subsequently denied USDA's motions. (Doc. 44 at 1–2; Doc. 47 at 8–19). The Court held that questions of fact concerning whether USDA effectively controlled the Montana Beef Council precluded granting summary judgment in favor of R-CALF at that time. (Doc. 44 at 1–2; Doc. 47). The Court did determine, however, that R-CALF had demonstrated the

4

need for a preliminary injunction, by showing that it would likely succeed on the merits. (Doc. 47 at 19–22); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

In the years following the Court's 2017 issuance of the preliminary injunction (Doc. 47), USDA entered into Memoranda of Understanding ("MOU"s) with over a dozen QSBCs. (Doc. 99 at 7). The only MOU entered into before the Court issued a preliminary injunction (Doc. 47) came after the Magistrate entered Findings and Recommendations, which supplied the basis for the Court's determination. (Doc. 44). The MOUs include a number of measures to strengthen USDA's oversight over QSBCs' use of checkoff proceeds, including QSBCs' agreement to submit to USDA "for pre-approval any and all promotion, advertising, research, and consumer information plans and projects." (Doc. 135 at 3). As a result of the MOUs, USDA has broad new authority over any potential speech that the QSBCs might produce. (Doc. 147 at 2). The parties filed competing motions for summary judgment in 2019. (Docs. 89, 94, 98).

The Court reviewed those motions and issued an Order granting summary judgment in favor of USDA. (Doc. 147). The Court found that the MOUs provided USDA with sufficient control of QSBCs' speech to qualify as government speech. *Id.* The Court's grant of summary judgment in favor of USDA vacated its prior preliminary injunction. (Doc. 160 at 6). That 2017 preliminary

5

injunction was the only judicially mandated relief that R-CALF obtained during the course of this lawsuit. *Id.*

R-CALF now moves for $145,428.08 in attorney fees and $5,344.17 in costs associated with procuring the 2017 preliminary injunction. (Doc. 152). USDA counters that R-CALF was not a "prevailing party" and is therefore not entitled to attorney fees and litigation costs under the EAJA. (Doc. 160 at 12).

## DISCUSSION

The EAJA authorizes federal courts to award attorney fees, costs, and other expenses when a party prevails against the United States. *Hardisty v. Astrue*, 592 F.3d 1072, 1076 (9th Cir. 2010). This fee-shifting is not mandatory, however. *Id.* Eligibility for fees and costs under the EAJA requires, among other conditions: "(1) that the claimant be a prevailing party; [and] (2) that the Government's position was not substantially justified." *Comm'r INS v. Jean*, 496 U.S. 154, 158 (1990). The applicant for fees bears the burden of establishing that it was the "prevailing party." *Carvajal v. United States*, 521 F.3d 1242, 1249 (9th Cir. 2008). If the applicant meets its initial burden, the burden shifts to the government to show that its position was "substantially justified." *Hardisty*, 592 F.3d at 1076 n. 2. The Court has an independent duty to review the fee applicant's itemized log of hours to determine the reasonableness of the hours requested in each case. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 436–37 (1983).

## I.    Whether R-CALF was a "prevailing party" under the EAJA.

The Court must first determine whether R-CALF has shown that it was the prevailing party. R-CALF argues that it prevailed because the Court's entry of the preliminary injunction prompted USDA's entrance into MOUs with certain QSBCs. (Doc. 153 at 13–15). A fees applicant qualifies as a "prevailing party" "when actual relief on the merits of his [or her] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 715 (9th Cir. 2013) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)). "Relief on the merits" occurs when the material alteration in the parties' legal relationship was prompted by "judicial imprimatur." *Id.* (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Res.*, 532 U.S. 598, 605 (2001)). Judicial imprimatur can be found in the form of an enforceable judgment on the merits, a court-ordered consent decree, or a preliminary injunction involving "a judicial determination that the claims on which the plaintiff obtains relief are potentially meritorious." *Id.*

The Ninth Circuit asks two questions in a prevailing party analysis where the plaintiff received a preliminary injunction: (1) whether the court's preliminary injunction ruling was sufficiently "on the merits" to satisfy the "judicial imprimatur" requirement; and, if yes, (2) whether the plaintiff "obtained relief

sufficiently enduring to satisfy the 'material alteration of the parties' legal relationship' requirement." *Id.* at 716.

Here, the Court granted R-CALF's preliminary injunction on the basis that it "likely will succeed on its First Amendment claim due to the compelled private speech." (Doc. 47 at 19). The preliminary injunction that R-CALF received therefore satisfies the judicial imprimatur requirement. The Court must next determine whether R-CALF's preliminary injunction was a "sufficiently enduring" material change in the parties' legal relationship.

A material alteration of the parties' legal relationship occurs where "the plaintiff can force the defendant to do something he otherwise would not have to do." *Higher Taste*, 717 F.3d at 716. Generally, a plaintiff who succeeds at the preliminary injunction stage, but loses on the merits after the case is litigated to final judgment, is not a prevailing party under the EAJA. *Id.* at 717. This is generally true because the plaintiff's preliminary injunction victory proves "ephemeral" by not effecting an "enduring" change in the legal relationship of the parties. *Id.* (citing *Sole v. Wyner*, 551 U.S. 74, 86 (2007)). However, "there may be circumstances in which a preliminary injunction results in sufficiently enduring change to warrant an award of fees, even in the absence of a final judgment on the merits." *Id.* Those circumstances arise where the plaintiff wins a preliminary injunction and the case becomes moot before final judgment. The mootness can be

8

caused by "the passage of time or other circumstances beyond the parties' control," or by "the defendant's own actions." *Id.*

USDA argues two points in support of its position that R-CALF does not qualify as a prevailing party under the EAJA. USDA first relies on *Sole v. Wyner*, 551 U.S. 74, 78 (2007), to assert that a party who secures a preliminary injunction that a court later vacates cannot satisfy the prevailing party requirement. (Doc. 160 at 13–18). USDA states that the preliminary injunction awarded to R-CALF in this case was not an "enduring change," but was instead vacated. (Doc. 160 at 16). USDA's second argument asserts that R-CALF cannot be the prevailing party because USDA made a voluntary choice to enter the MOUs. (Doc. 160 at 18–23). USDA states that, since no court order compelled it to enter into the MOUs, R-CALF cannot show that it received "judicially sanctioned" relief. *Id.*

The Court is persuaded by R-CALF's argument that the change brought about by the issuance of the preliminary injunction was sufficiently enduring to constitute a material alteration in the parties' legal relationship. Prior to litigation, QSBCs like Montana Beef Council directed and determined their promotional activities, using private funds without adequate government oversight. (Doc. 44 at 3). The Court granted R-CALF a preliminary injunction upon a showing that it would likely succeed on the merits of its First Amendment challenge. (Doc. 47). USDA entered into all but one of the MOUs following the Court's issuance of the

9

preliminary injunction. *Id.* The only MOU entered into before the Court's entry of a preliminary injunction (Doc. 47) came after the Magistrate entered Findings and Recommendations, outlining R-CALF's likelihood of success on the merits of its claim. (Doc. 44). The Court's subsequent summary judgment ruling in favor of USDA occurred as a result of USDA's entrance into MOUs with QSBCs, which expanded the control that USDA exercises over QSBCs' promotional activities. (Docs. 135 at 14; 147 at 10–11).

In the Order granting summary judgment in favor of USDA, the Court held that USDA's entry into the MOUs was indicative of USDA enacting "a broader policy change, not a change with the sole aim of ending th[e] litigation." (Doc. 147 at 25). This determination was in answer to whether USDA's entry into MOUs had "completely and irrevocably cured" the alleged First Amendment violation. Although entry into the MOUs suggested that USDA was implementing broader policy changes, this change had a lasting effect on the parties' legal relationship, leaving USDA and QSBCs "entrenched" in the procedure outlined in the MOUs and resolving R-CALF's complained-of injury. *Id.*

As a result of the MOUs, the preliminary injunction was transformed from a temporary measure "capable of being undone" into "a lasting alteration of the parties' legal relationship," by securing for R-CALF the outcome that it sought— an end to USDA's allegedly unconstitutional government-compelled subsidy of

speech. *Higher Taste*, 717 F.3d at 718. This result provides the Court with assurance that the change between the parties was sufficiently enduring to render R-CALF a "prevailing party" for purposes of the EAJA.

## II.   Whether USDA's position was "substantially justified."

R-CALF has met its burden of establishing that it was the "prevailing party" over USDA in securing the preliminary injunction. The burden now shifts to USDA to show that it was "substantially justified," both its litigating position and in its "action or failure to act." *Abela v. Gustafson*, 888 F.2d 1258, 1264 (9th Cir. 1989) (quoting 28 U.S.C. § 2412(d)(2)(D)). Ninth Circuit jurisprudence therefore focuses on two questions: (1) "whether the government was substantially justified in taking its original action"; and (2) "whether the government was substantially justified in defending the validity of the action in court." *United States v. Marolf*, 277 F.3d 1156, 1161 (9th Cir. 2002) (quoting *Gutierrez v. Barnhart*, 274 F.3d 1255, 1258 (9th Cir. 2001)). A position proves substantially justified where it "has a reasonable basis in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 566 n.2 (1988). "[F]ees generally should be awarded where the government's underlying action was unreasonable even if the government advanced a reasonable litigating position." *Marolf*, 277 F.3d at 1159.

USDA asserts in its response to the Motion for Attorney Fees that it has held the same litigating position since 2016: "that the MOUs provide sufficient control

11

to render the QSBCs' speech government speech."[1] (Doc. 160 at 23). It argues that R-CALF's argument for fees "appears to largely acquiesce" with USDA's position. *Id.* R-CALF counters that USDA argued throughout the litigation that the MOUs were unnecessary, and the Beef Act and its regulations were sufficient. (Doc. 161 at 12). R-CALF asserts that, even if USDA's position changed after the preliminary injunction issued, its post-injunction position proves irrelevant, as R-CALF seeks only fees and costs incurred in procuring the preliminary injunction. *Id.* USDA posits that *Comm'r, INS v. Jean*, 496 U.S. 154 (1990), requires the Court to look to its litigating position "as an inclusive whole," rather than its position pre- and post-injunction. (Doc. 160 at 25).

As a starting point, the Court finds that *Jean* does not stand for the proposition that a court may only determine the reasonableness of the government's position as it stands at the litigation's conclusion. The district court in *Jean* had already determined that the government's position in the underlying litigation was not substantially justified. *Jean*, 496 U.S. at 156. In determining the fee award, the government argued that the court must make a second finding on the

---

[1] This statement proves technically accurate but lacks context. The Court issued Findings and Recommendations on R-CALF's motion for a preliminary injunction on December 12, 2016. (Doc. 44). USDA filed an objection to the Findings and Recommendations, within the required two-week deadline, on December 23, 2016. (Doc. 45). USDA informed the Court in its objection of its recent entry into an MOU with Montana Beef Council. *Id.* at 8. USDA argued in the objection that the MOU had cured any First Amendment issue raised by R-CALF by expanding the degree of control that USDA exercises over Montana Beef Council's advertising campaigns. *Id.*

justifiableness of its position in the subsequent fees litigation before respondents were eligible for costs of services rendered in moving for fees. *Id.*

*Jean* therefore involved a narrow question, namely, whether a court must make a second finding of no "substantial justification" in subsequent fee litigation. *Id.* at 156–57. The United States Supreme Court found that the argument that the government may assert a "substantial justification defense" at multiple stages of an action lacked support. *Id.* at 159. The requirement that a court determine whether the government's position "as a whole" was substantially justified relates to the court's consideration of both the government's litigation position *and* its pre-litigation conduct. *Marolf*, 277 F.3d at 1161. The "as a whole" language does not, as USDA maintains, require the Court to consider the government's litigation position beyond the circumstance under which R-CALF became the prevailing party. USDA only adopted its position regarding the MOUs' sufficiency in addressing the compelled private speech argument *after* this Court issued Findings and Recommendations determining that R-CALF would likely succeed on the merits of its claim. (Doc. 44 at 11).

The Court considers whether USDA was substantially justified in its pre-litigation conduct, and in the litigation position that it held up until the Court issued Findings and Recommendations advising issuance of a preliminary injunction. USDA cites Ninth Circuit decisions in *Delano Farms Co. v. Cal. Table Grape*

13

*Comm'n*, 586 F.3d 1219 (9th Cir. 2009), and *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003 (9th Cir. 2007), as the support upon which it based both its pre-litigation conduct and its pre-injunction litigation position. (Doc. 160 at 25). USDA contends that the Beef Act and the Beef Order had implemented the beef checkoff assessment program, which "had been operating . . . for decades." (Doc. 160 at 26). As a result, USDA argues that its pre-litigation conduct in permitting the program's operation to continue, albeit with limited government oversight over QSBCs' use of the checkoff funds, was reasonable. *Id.* USDA argues that *Delano Farms* and *Paramount Land Co.* give reasonable support for USDA's argument that the Beef Act and its regulations provide a sufficient "*potential* or *statutorily authorized* level of government control" to make QSBCs' use of checkoff funds constitutional. *Id.* A review of the record indicates that USDA was not substantially justified in its pre-litigation conduct or in the litigation position that it held until the Court issued the preliminary injunction.

Speech becomes "government speech" when it is subject to democratic accountability. *Johanns v. Livestock Marketing Association*, 544 U.S. 550, 563 (2005). In *Johanns*, the United States Supreme Court outlined several key considerations for determining whether the government exercises a sufficient degree of control over the compelled speech of commodity marketing board programs to render the speech constitutional. *Id.* at 560–61. The ultimate question

14

asks whether the program's message "is 'from beginning to end' that of the [Government]." *Delano Farms*, 586 F.3d at 1228 (quoting *Johanns*, 544 U.S. at 560). The *Johanns* Court held that, because a politically accountable official oversaw the program at issue, "and retain[ed] absolute veto power over the advertisements' content, right down to the wording," the compelled funding subsidized government speech. *Johanns*, 544 at 563–64.

The Court first addresses USDA's argument that its pre-litigation conduct was reasonable because USDA believed that the Beef Act and its regulations, in operation "for decades," rendered constitutional QSBCs' use of checkoff funds. *See* Doc. 160 at 26. Contrary to USDA's assertions, "business as usual" does not demonstrate to the Court that its pre-litigation conduct was substantially justified. *Johanns* made clear that the beef checkoff program operates lawfully only where the government controls all the speech generated by the checkoff funds, "right down to the wording." *Johanns*, 544 at 563. USDA should have known that the program that R-CALF challenged was unconstitutional, given the limited control that USDA exercised over the QSBCs' speech and lack of compliance with the requirements of *Johanns*. The Court determines that USDA was not substantially justified in its underlying conduct.

The Court next addresses USDA's pre-injunction litigation position. USDA relied upon the Ninth Circuit's application of *Johanns* in *Paramount Land Co.* and

*Delano Farms Co.* to bolster its pre-injunction argument that the QBSCs' use of

checkoff assessments was adequately controlled by USDA. (Doc. 39 at 21). The

Court must determine whether USDA's argument to this effect "had a reasonable

basis in law and fact." *Pierce*, 487 U.S. at 565. The Court reviewed USDA's

argument when deciding whether to grant R-CALF's motion for a preliminary

injunction. (Doc. 44). The Court found that summary judgment in favor of R-

CALF was precluded at that stage by remaining questions of fact. *Id.* at 1–2.

USDA failed to establish, however, that it exercised enough control over the

speech of QSBCs to render the speech as that of the government. USDA knew that

it did not exercise control over the QSBCs' speech "from beginning to end" as

required in *Johanns*, 544 at 560. Absent that requisite level of control, USDA's

litigation position lacked a reasonable basis in law and was therefore not

substantially justified.

## III.   Whether R-CALF's attorney fees are reasonable.

After determining that R-CALF was the prevailing party and that USDA

lacked a substantial justification for its position, the Court has an independent duty

to review the fee applicant's itemized log of hours to determine the reasonableness

of the hours requested in each case. *Hensley*, 461 U.S. at 433, 436–37. R-CALF, as

the fees applicant, bears the burden of demonstrating that the hourly rate is

appropriate and the hours are reasonable. *Gates v. Deukmejian*, 987 F.2d 1392,

16

1397–98 (9th Cir. 1992). The Court must provide a "concise but clear" explanation

of its reasons for the fee award. *Id.* at 1398.

The Court must base its fee award "upon the prevailing market rates for the

kind and quality of the services furnished, except that . . . attorney fees shall not be

awarded in excess of $125 per hour unless the court determines that an increase in

the cost of living . . . justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). Pursuant to

Ninth Circuit authority, courts may increase the $125 per hour rate to account for

the cost of living as adjusted by the year the work was performed. *Thangaraja v.*

*Gonzales*, 428 F.3d 870, 876–77 (9th Cir. 2005). "Appropriate cost-of-living

increases are calculated by multiplying the $125 statutory rate by the annual

average consumer price index figure for all urban consumers ("CPI-U") for the

years in which counsel's work was performed, and then dividing by the CPI-U

figure for March 1996, the effective date of EAJA's $125 statutory rate."

*Thangaraja*, 428 F.3d at 867–77.

R-CALF requests fees for work performed by its attorneys in the years 2015,

2016, 2017, 2018, and 2020. All told, R-CALF seeks $145,428.08 in attorney fees

and $5,344.17 in costs. R-CALF's fees and costs calculation uses those rates set by

the Ninth Circuit for EAJA cases. Included in R-CALF's hourly calculation are

hours expended filing and briefing the instant motion. R-CALF's counsel fully

documented the time spent advancing this case with detailed time records. R-

CALF's time log details the time that counsel spent on several tasks, each of which was directly tied to achieving the client's goals. *See Balla v. State of Idaho*, 677 F.3d 910, 920–21 (9th Cir. 2012). R-CALF took diligent steps to ensure the reasonableness of its fees and costs request.

The Court determines that R-CALF has met its burden of establishing the reasonableness of the hourly rate and hours for which it seeks compensation. USDA did not address R-CALF's fees calculation in its briefing on R-CALF's motion. Therefore, USDA has not put on evidence rebutting the reasonableness of R-CALF's request.

## CONCLUSION

The Court concludes that R-CALF qualifies as a "prevailing party," and that USDA's position lacks substantial justification. R-CALF is eligible under the EAJA for an award of fees and costs associated with procuring the preliminary injunction against USDA. The Court grants R-CALF's application for fees in the amount of $145,428.08, and for costs in the amount of $5,344.17.

## ORDER

Accordingly, **IT IS ORDERED** that Plaintiff R-CALF's Motion for Attorney Fees and Costs (Doc. 152) is **GRANTED**.

Dated this 9th day of February, 2021.

John Johnston
United States Magistrate Judge

18